R. Todd **NEILSON** as Trustee of the Bankruptcy Estate of Reed E. Slatkin, Wesley West Flexible Partnership, Stuart W. Stedman; Stedman West Family Partnership, Ltd. As Successor to Wesley West Long Term Partnership Ltd.; Stuart W. Stedman as Trustee of the Neva and Wesley West Foundation; Wesley West Minerals, Ltd.; George V. Kriste, John K. Poitras, Michael B. Azeez; Michael B. Azeez as Trustee of the Azeez Foun-

dation; Michael B. Azeez as Trustee of the Betty Shapiro Trust; Michael B. Azeez as Trustee of the Thomas Di Maggio Trust; Michael B. Azeez as General Partner and on Behalf of Sazeez L.P.; Anthony Podell; Gregory B. Abbott, Fred Ockrim; Sheri L. Ockrim; And The Following Individuals In Their Individual and Representative Capacities On Behalf Of All Those Similarly Situated: Steven M. Besserman; Linda A. Besserman; Ric Jackson; Cynthia Jackson; Anita Kaplan; Michael Kaplan; Susan Safirstein; Jaroslav J. Marik; And California Community Foundation as Trustee of the Barbara L. Dewey Charitable Lead Annuity Trust, Plaintiffs,

v.

UNION BANK OF CALIFORNIA, N.A.; Comerica Bank–California; Imperial Management Incorporated; Bank of Orange County; Mary Catherine Leider; and Does 1 through 10, Defendants.

No. CV02–06942MMMCWX.

United States District Court, C.D. California.

Oct. 20, 2003.

R. Alexander Pilmer, Amanda Jane Wong, Christopher Thomas Casamassima, and Richard L. Wynne, Kirkland & Ellis, and Mary E. Newcombe, Caldwell, Leslie, Newcombe & Pettit, Los Angeles, CA, for plaintiffs.

A. William Urquhart, Christopher Tayback and Martin Howard Pritikin, Quinn, Emanuel, Urquhart, Oliver & Hedges, Arya Towfighi, David Lewis Hirsch, and Jamila A. Berridge, McDermott Will & Emery Los Angeles, CA, and Steven L. Bergh, Prenovost, Normandin, Bergh & Dawe, Santa Ana, CA, for defendants.

ORDER GRANTING DEFENDANT COMERICA'S MOTION TO DISMISS THIRD AMENDED COMPLAINT;

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT IMPERIAL'S MOTION TO DISMISS THIRD AMENDED COMPLAINT;

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT UNION BANK OF CALIFORNIA, N.A.'S MOTION TO DISMISS THIRD AMENDED COMPLAINT;

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT BANK OF ORANGE COUNTY'S MOTION TO DISMISS THIRD AMENDED COMPLAINT; AND

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CATHERINE MARY LEIDER'S MOTION TO DISMISS THIRD AMENDED COMPLAINT

ORDER GRANTING DEFENDANT UNION BANK OF CALIFORNIA, N.A.'S MOTION TO STRIKE

MORROW, District Judge.

This class action seeks damages from Union Bank of California, Comerica Bank

of California, Imperial Management, Inc., and Bank of Orange County, each of which is alleged to have conspired with Reed Slatkin in effecting a Ponzi scheme that defrauded hundreds of investors out of hundreds of millions of dollars. Plaintiffs allege that these defendants knowingly participated in and facilitated the Ponzi scheme by providing Slatkin with credit, allowing Slatkin to commingle personal and investor funds, and lending their name and prestige to his operations.

## I. FACTUAL BACKGROUND

### A. The Alleged Ponzi Scheme

Plaintiffs filed this action in federal court on September 5, 2002, alleging claims for aiding and abetting a breach of fiduciary duty, aiding and abetting fraud, breach of fiduciary duty, fraud, negligent misrepresentation, constructive fraud, negligence and violation of California Business and Professions Code §§ 17200 et seq. Plaintiffs filed a first amended complaint on October 23, 2002, that asserted identical causes of action. Defendants moved to dismiss the first amended complaint. On February 20, 2003, the court granted in part and denied in part defendants' motion to dismiss. Plaintiffs filed a second amended complaint on April 14, 2003. On May 20, 2003, the parties submitted a stipulation that plaintiffs be allowed to file a third amended complaint withdrawing Count XI as well as a request for statutory penalties under California Business & Professions Code § 17200. The court subsequently entered an order on the parties' stipulation.

The third amended complaint defines the putative class plaintiffs seek to represent as "all individuals or entities that (a) made claims in the bankruptcy of Reed E. Slatkin; and (b) received in return less money from Reed E. Slatkin than they entrusted to him to invest." [1] Additionally, the pleading identifies, by name and amount invested, eighteen individuals and/or entities allegedly defrauded by Slatkin and the banks. [2] It asserts that each of these "class representatives" falls within the class defined above.

Slatkin allegedly began his career as a full-time investment advisor during the mid-1980's, and invested money on behalf of a variety of individuals. [3] Soon after Slatkin began accepting money from others to invest, he allegedly developed and executed a scheme to defraud those who entrusted their funds to him. [4] One artifice Slatkin used to carry out the scheme was a limited partnership called the Reed Slatkin Investment Club L.P. [5] Slatkin was general partner of the Club; its limited partners were individuals who gave Slatkin money to invest on their behalf. [6] Slatkin actively ran the Club until he filed for bankruptcy on May 1, 2001. [7] Plaintiffs allege that Slatkin operated a classic Ponzi scheme, [8] i.e., he used monies paid by later investors to pay artificially high returns to initial investors, with the ultimate goal of attracting still more investors. [9] In reality, plaintiffs allege, Slatkin's investment portfolio bore little resemblance to the claims he made. [10] Plaintiffs assert that Slatkin spent investors' money on a lavish lifestyle, commingled investors' funds, and

1. Third Amended Complaint, ¶ 33.

2. *Id.,* ¶¶ 9–26.

3. *Id.,* ¶ 41.

4. *Id.,* ¶ 41.

5. *Id.,* ¶ 45.

6. *Id.*

7. *Id.*

8. *Id.,* ¶ 42.

9. *Id.*

10. *Id.*

paid false returns to some investors with the principal paid by others.[11] Slatkin allegedly received nearly $600,000,000 from investors; of this, approximately $250,000,000 has never been returned, and is still owed to class members.[12]

## B. Allegations Against Defendants

Plaintiffs have sued four separate banking institutions—Union Bank of California, Comerica Bank–California, Bank of Orange County, and Imperial Management, Inc. (collectively "the Banks"). Defendant Union Bank is sued in its individual capacity and as successor to the trust business of Imperial Trust, which it acquired in May 1999.[13] Defendant Bank of Orange County is sued as the direct successor-in-interest to Pacific Inland Bank.[14] Defendant Imperial Management, Inc. is sued as the direct successor-in-interest to Imperial Trust Company.[15] Defendant Comerica Bank is sued as the successor by merger to Imperial Bank (the prior parent of Imperial Trust) and as the alter-ego of co-defendant Imperial Management, Inc., Comerica's wholly-owned subsidiary.[16] The liability of all four defendants, therefore, hinges on the alleged conduct of Imperial Trust Company, Pacific Inland Bank and/or Union Bank. Plaintiffs have also sued one individual, Mary Catherine Leider, for wrongful acts and omissions allegedly committed as administrator of accounts that had investments in the Club, first at Pacific Inland, and later at Imperial.[17]

Plaintiffs allege that Slatkin's investment scheme depended for its success on the involvement of the defendant Banks. The Banks, or their predecessors-in-interest, allegedly provided Slatkin with three types of assistance: (1) a steady flow of new money; (2) a mechanism for managing investors' custodial accounts; and (3) an aura of legitimacy that allowed the scheme to flourish.[18] Plaintiffs contend that Slatkin established accounts at the Banks, and induced dozens of investors to transfer millions of dollars to "custodial" or "trustee" accounts there.[19] Upon receipt of the investors' cash, the Banks allegedly transferred the money into accounts established in the name of the Club. With the Banks' alleged knowledge and assistance, Slatkin then commingled new investors' money with his own and other investors' money. Most of the accounts were held at Pacific Inland Bank, Imperial Trust, and commencing in May 1999, Union Bank. Santa Barbara Bank & Trust held the remaining Club accounts. Plaintiffs further allege that, due to the legitimacy conferred on the scheme by the Banks' involvement, Slatkin convinced individuals to give him money directly.[20] In addition to lending their prestige to Slatkin, the Banks allegedly vouched for his skill and trustworthiness when asked.[21]

Plaintiffs make numerous specific allegations regarding the conduct of each of the Banks. As respects Imperial and Pacific Inland (Imperial's predecessor-in-interest), the complaint alleges that individual offi-

11. *Id.*

12. *Id.,* ¶ 44.

13. *Id.,* ¶ 27.

14. *Id.,* ¶ 31.

15. *Id.,* ¶ 29.

16. *Id.,* ¶ 28.

17. *Id.,* ¶ 32.

18. *Id.,* ¶ 43.

19. *Id.,* ¶ 47.

20. *Id.,* ¶ 48.

21. *Id.,* ¶ 49.

cers at both Banks acted as salespersons for Slatkin and encouraged individuals to invest with Slatkin.[22] Plaintiffs also contend that individuals at Imperial and Pacific Inland represented to investors that the Club was audited annually, even though neither Bank ever conducted such an audit.[23] They further allege that Imperial failed to certify investors' account statements despite an obligation to do so,[24] and that it purportedly encouraged investors to rely on its official "certified" statements rather than Slatkin's unofficial reports.[25] Plaintiffs allege that Imperial was aware of Slatkin's illegal activities due to the highly unusual nature of the Club.[26] Finally, they assert that Slatkin bribed Mary Catherine Leider, the Club account manager at Imperial, to assist him in the operation of his Ponzi scheme.[27]

As respects Union Bank (which acquired Imperial's trust business in May 1999), plaintiffs allege that, like Imperial, it failed properly to value the investments of the class members, and to audit the investments held in Slatkin accounts as it was required to do.[28] They assert that, in violation of its own policies, Union Bank allowed Slatkin to overdraw the Club checking account by hundreds of thousands of dollars,[29] and extended a $4,000,000 unsecured line of credit to Slatkin in February 2000.[30] Finally, they allege that Union Bank performed "inappropriate favors" for Slatkin to induce him to provide additional business to it.[31] Plaintiffs allege generally that Union Bank knew or should have known of Slatkin's illegal activities.[32]

Plaintiffs argue that all of the Banks "rubber-stamped" the false information Slatkin gave them, and treated the client accounts as "one common pool of fungible and liquid assets."[33] They also allege that each of the Banks, in its own right or through a predecessor-in-interest, actively participated in Slatkin's Ponzi scheme with constructive and/or actual knowledge of his crimes.[34] They maintain that each of the Banks knew or should have known that Slatkin was operating a Ponzi scheme,[35] and that, without the assistance provided by the Banks, Slatkin's Ponzi scheme could not have succeeded.[36]

Based on these allegations, plaintiffs' third amended complaint pleads eleven claims for relief: (1) aiding and abetting a breach of fiduciary duty; (2) aiding and abetting fraud; (3) breach of fiduciary duty; (4) fraud; (5) negligent misrepresentation; (6) constructive fraud; (7) negligence; (8) violation of California Business and Professions Code §§ 17200 et seq.; (9) intentional fraudulent transfer (seven years); (10) intentional fraudulent transfer (four years); and (11) constructive fraudulent transfer (four years). The first two claims are brought by all plaintiffs except Neilson against all defendants. The third, fourth, fifth, sixth and seventh claims are

22. *Id.,* ¶¶ 50–53.

23. *Id.,* ¶¶ 54–55.

24. *Id.,* ¶¶ 56–57.

25. *Id.,* ¶ 61.

26. *Id.,* ¶¶ 62–68.

27. Id., ¶¶ 69–73.

28. *Id.,* ¶¶ 80–83.

29. *Id.,* ¶¶ 86–90.

30. *Id.,* ¶¶ 92–95.

31. *Id.,* ¶ 96.

32. *Id.,* ¶ 99.

33. *Id.,* ¶¶ 100–103.

34. *Id.,* ¶¶ 104–105.

35. *Id.,* ¶¶ 106–116.

36. *Id.,* ¶ 116.

brought by plaintiffs Fred Ockrim, Sheri Ockrim, and Jaroslav Marik against all defendants, and by plaintiffs Wesley West Flexible Partnership, Stedman Family Partnership, Ltd., Stedman as Trustee of the Neva and Wesley West Foundation, George Kriste, Fred Ockrim, Sheri Ockrim, Jaroslav Marik, and California Community Foundation ("CCF") against all defendants except Bank of Orange County. The eighth claim is brought by all plaintiffs against all defendants. The last three claims are brought by plaintiff Neilson against Union Bank, Comerica Bank and Imperial Management. Plaintiffs seek approximately $200 million in damages on each of the first two claims, and approximately $24 million on counts three through eight. As respects the fraudulent transfer claims, plaintiffs seek (a) to avoid any transfer of money by Slatkin to the Banks within a specified seven or four year period ("the Seven–Year Period" and "Four–Year Period" respectively); (b) to impose a constructive trust on any transfer of money from Slatkin within the Seven–Year Period or the Four–Year Period, or any proceeds of the transfers; and (c) to require the Banks to convey to the Trustee the value of any transfer of money to them by Slatkin with the Seven–Year Period or Four–Year Period, as well as any proceeds of such transfers. Plaintiffs seek attorneys' fees on all counts.

All five defendants have moved to dismiss the third amended complaint. Defendant Comerica Bank asserts that the complaint fails adequately to allege its liability either as the alter ego of Imperial Management or as the successor-in-interest to Imperial Bank. Defendant Imperial Management contends that the aiding and abetting claims and the fraudulent transfer claim that invokes a seven-year reach back period must be dismissed. Defendant Union Bank challenges the aiding and abetting claims and all claims brought by plaintiff Ockrim. Defendant Bank of Orange County seeks dismissal of the claims for aiding and abetting, breach of fiduciary duty, fraud, negligent misrepresentation, constructive fraud, violation of Business & Professions Code § 17200, and all claims brought by Ockrim. Finally, defendant Leider asserts that the claims for aiding and abetting, breach of fiduciary duty, constructive fraud, fraud, and negligent misrepresentation are deficient. As all motions address similar issues, the court considers them jointly in this order.

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. FED.R.CIV.PROC. 12(b)(6). A court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). See also *Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir.1989); *Haddock v. Board of Dental Examiners*, 777 F.2d 462, 464 (9th Cir. 1985) (stating that a court should not dismiss a complaint if it states a claim under any legal theory, even if plaintiff erroneously relies on a different theory). In other words, a Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988).

In deciding a motion to dismiss for failure to state a claim, the court's review is limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir.1996); *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69

F.3d 381, 385 (9th Cir.1995). The court must accept all factual allegations pleaded in the complaint as true, and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens,* 57 F.3d 747, 750 (9th Cir.1995) (citing *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987)); *NL Indus. Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). It need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981), cert. denied, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

In addition to the allegations of the complaint, a court may consider exhibits submitted with the complaint, documents whose contents are alleged in the complaint when authenticity is not questioned, and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201.[37] *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), cert. denied, 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994), overruled on other grounds, *Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555, n. 19 (9th Cir.1989).

### B. Defendants' Requests For Judicial Notice

Four of the five defendants have requested that the court take judicial notice of various documents in ruling on their motions.

### 1. Union Bank

Union Bank has requested that the court take judicial notice of the following documents:

a. Declaration of Reed E. Slatkin in Support of Trustee's *Ex Parte* Application for a Right to Attach Order And Order for Issuance of Writ of Attachment, filed on August 28, 2002, in *In re: Reed Slatkin,* Case No. ND 01–11549–RR (Bankr.C.D.Cal.) (*"Slatkin "*);[38]

b. Complaint for Disallowance (i.e., Objection) and Equitable Subordination of Claim Nos. 437 and 535, and Declaration of Jolynn Runolfson in support thereof, filed in *Slatkin* on April 23, 2003;[39]

c. The Second Amended Complaint, dated August 20, 2002, in *Wesley West Flexible Partnership, et al. v. Union Bank of California, et al.,* CV 02–964 RSWL (*"Wesley West "*);[40]

d. September 18, 2002, Order in *Christensen v. Union Bank of California, N.A.,* CV 02–608 MMM (CWx) (*"Christensen "*);[41]

e. January 6, 2003, Order in *Christensen;*[42]

f. Disclosure Statement to Accompany Chapter 11 Trustee and Creditors' Committee Joint Plan of Reorganization, dated January 30, 2003, filed in *Slatkin.*[43]

---

37. Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

38. Defendant Union Bank of California's Request for Judicial Notice (*"Union Bank's Req."*), Exh. A.

39. *Id.,* Exh. B.

40. *Id.,* Exh. C.

41. *Id.,* Exh. D.

42. *Id.,* Exh. E.

43. Defendant Union Bank of California's Second Request for Judicial Notice (*"Union Bank's Second Req."*), Exh. A.

g. Stipulation Re: Briefing Schedule for Defendants' Motions to Dismiss Plaintiffs' First Amended Complaint; and [Proposed] Order Thereon, filed October 25, 2002, in this case; [44]

h. Stipulation re Filing of Third Amended Complaint and [Proposed] Order, filed May 15, 2003, in this case; [45] and

i. Second Amended Complaint, dated October 15, 2002, in *Christensen*. [46]

Under the Federal Rules of Evidence, courts may take judicial notice of facts that are not subject to reasonable dispute, either because they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." FED. R. EVID. 201.

 Court orders and filings are the type of documents that are properly noticed under the rule. Notice can be taken, however, "only for the limited purpose of recognizing the 'judicial act' that the order represents on the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994) (citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)). See also *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082, n. 6 (7th Cir.1997) ("We agree that courts generally cannot take notice of findings of fact from other proceedings for the truth [of the matter] asserted therein because these findings are disputable and usually are disputed"); *Goetz v. Capital Factors, Inc.*, 120 F.3d 268, 1997 WL 415340, * 1–2 (9th Cir. July 22, 1997) (Unpub.Disp.) ("although a court may take judicial notice of its own records, it cannot take judicial notice of the truth of the contents of all documents found therein"); *San Luis v. Badgley*, 136 F.Supp.2d 1136, 1146 (E.D.Cal.2000) (quoting *Jones* for the proposition that a court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the litigation, but rather to establish the fact of such litigation and related filings"). Applying this standard, the court takes judicial notice of the existence and legal effect of the documents submitted by Union Bank.

**2. Comerica Bank And Imperial Management, Inc.**

Comerica and Imperial have requested that the court take judicial notice of the following documents:

a. The January 6, 2003 transcript of proceedings in *Christensen;* [47]

b. The February 20, 2003 Order Granting Motions to Dismiss entered in this case; [48]

c. Plaintiff's Opposition to Imperial's Motion to Dismiss First Amended Complaint in this case; [49]

d. Plaintiff's Opposition to Motion to Strike Portions of the First Amended Complaint in this case; [50]

e. Reply of Comerica Bank in Support of Motion to Dismiss Plaintiffs' First Amended Complaint in this case; [51] and

---

44. *Id.*, Exh. B.

45. *Id.*, Exh. C.

46. *Id.*, Exh. D.

47. Defendants Comerica Bank of California and Imperial Management, Inc.'s Request for Judicial Notice ("Comerica Banks' Req."), Exh. A.

48. *Id.*, Exh. B.

49. *Id.*, Exh. C.

50. *Id.*, Exh. D.

51. *Id.*, Exh. E.

f. The January 6, 2003 transcript of proceedings in this action.[52]

For the reasons discussed above, the court takes judicial notice of the existence and legal effect of the documents submitted by Comerica and Imperial.

### 3. Bank of Orange County

The Bank of Orange County has requested that the court take judicial notice of the following documents:

a. April 2, 2003, Civil Minutes, granting in part Bank of Orange County's Motion to Compel;[53]

b. April 21, 2003, letter from plaintiff's counsel, Kirkland & Ellis;[54]

c. Memorandum and Opinion, filed January 9, 2002, in *Wesley West;*[55]

d. Pacific Inland Contract dated December 30, 1992, signed by Joanne Christensen;[56]

e. Pacific Inland Contract dated December 16, 1991, signed by Paul Hawken;[57]

f. Pacific Inland Contract dated June 24, 1991, signed by Thomas Rook;[58] and

g. Order Granting in Part and Denying in Part Defendant Union Bank of California's Motion to Dismiss the Second Amended Complaint in *Christensen.*[59]

 For the reasons stated earlier, the court takes judicial notice of the existence and legal effect of the documents identified in paragraphs a, c, and g. The court may also take judicial notice of the documents identified in paragraphs d, e, and f, as these are contracts between Pacific Inland Bank and putative class members that provide the foundation for plaintiffs' claims. "[A] district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir. 1998). As the *Parrino* court explained: "Although we have yet to apply this rule to documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint, such an extension is supported by the policy concern underlying the rule: preventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Id.* See also *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) ("... we have held that when a plaintiff chooses not to attach to the complaint or incorporate by reference a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce the prospectus when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure"); *In re Northpoint Communications Group, Inc., Securities Litigation,* 221 F.Supp.2d 1090, 1095 (N.D.Cal.2002) ("In ruling on a motion to dismiss, a court may take judicial notice of a document if it is relied on in the complaint (regardless of whether it is expressly incorporated therein) and its authenticity is not disputed," citing *Parrino* ); *Springate v. Weighmasters Murphy, Inc. Money Purchase Pension Plan,* 217 F.Supp.2d 1007, 1013 (C.D.Cal.2002) ("For

**52.** *Id.,* Exh. F.

**53.** Defendant Bank of Orange County's Request for Judicial Notice ("BOC Req."), Exh. A.

**54.** *Id.,* Exh. B.

**55.** *Id.,* Exh. C.

**56.** *Id.,* Exh. D.

**57.** *Id.,* Exh. E.

**58.** *Id.,* Exh. F.

**59.** *Id.,* Exh. G.

purposes of this Motion to Dismiss, this Court takes judicial notice of documents (1) and (2) only because these documents' contents are alleged in the Complaint, and their authenticity is not in question").

■ The April 21, 2003, letter from Kirkland & Ellis, however, identified in paragraph b, is not a proper subject of judicial notice. Its contents are not alleged in the third amended complaint and its authenticity is not undisputed. Compare *In re Amylin Pharmaceuticals, Inc., Securities Litigation,* No. 01CV1455BTM(NLS), 2002 WL 31520051, * 2 (S.D.Cal. Oct.10, 2002) ("Plaintiffs do not dispute the letter's authenticity and rely upon it implicitly in their [consolidated complaint] and in their opposition papers. The court may therefore take judicial notice of the October, 2001 letter"). Nor does it concern matters generally known within the court's territorial jurisdiction or capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. FED. R. EVID. 201. Accordingly, the Bank of Orange County's motion for judicial notice of the Kirkland & Ellis letter is denied.

## C. Comerica's Motion to Dismiss

Comerica argues that the claims against it must be dismissed because plaintiffs fail adequately to allege that Comerica is the alter ego of, and successor-in-interest to, Imperial Management, its wholly owned subsidiary.

### 1. Legal Standards Governing The Alter Ego Doctrine

■ "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation." *Mesler v. Bragg Management Co.,* 39 Cal.3d 290, 300, 216 Cal.Rptr. 443, 702 P.2d 601 (1985). The purpose of the doctrine is to bypass the corporate entity for the purpose of avoiding injustice. Its "essence... is that justice be done[,] ... [and t]hus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." *Id.* at 301, 216 Cal. Rptr. 443, 702 P.2d 601. See also *Roman Catholic Archbishop of San Francisco v. Superior Court,* 15 Cal.App.3d 405, 411, 93 Cal.Rptr. 338 (1971) ("The terminology 'alter ego' or 'piercing the corporate veil' refers to situations where there has been an abuse of corporate privilege, because of which the equitable owner of a corporation will be held liable for the actions of the corporation," citing *Minton v. Cavaney,* 56 Cal.2d 576, 579, 15 Cal.Rptr. 641, 364 P.2d 473 (1961)).

■ Before the doctrine may be invoked, two elements must be alleged: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v. Superior Court,* 83 Cal.App.4th 523, 526, 99 Cal.Rptr.2d 824 (2000); *Mesler, supra,* 39 Cal.3d at 300, 216 Cal.Rptr. 443, 702 P.2d 601 ("There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case. There are, nevertheless, two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result

will follow,' " quoting *Automotriz Del Golfo De California S. A. De C. V. v. Resnick,* 47 Cal.2d 792, 796, 306 P.2d 1 (1957)). See also *AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 591 (9th Cir.1996).

■ "[O]nly a difference in wording is used in stating the . . . concept where the entity sought to be held liable is another corporation instead of an individual." *Las Palmas Associates v. Las Palmas Center Associates,* 235 Cal.App.3d 1220, 1249, 1 Cal.Rptr.2d 301 (1991). Like other shareholders, a parent company is presumed to have an existence separate from its subsidiaries. Accordingly, the mere fact that it owns the stock of the subsidiary will not suffice to prove that the two entities are alter egos of one another; rather, the evidence must show that the wholly-owned subsidiary is merely a conduit for, or is financially dependent on, the parent corporation. *Institute of Veterinary Pathology, Inc. v. California Health Laboratories, Inc.,* 116 Cal.App.3d 111, 119, 172 Cal. Rptr. 74 (1981) (" 'With increasing frequency, courts have demonstrated a readiness to disregard the corporate entity when a wholly owned subsidiary is merely a conduit for, or is financially dependent on, a parent corporation. In the interests of justice and to prevent fraud, the courts will ignore the existence of a corporate entity used to cut off either causes of action against or defenses by another corporate entity,' " quoting 1A Ballantine & Sterling, CALIFORNIA CORPORATION LAWS, § 296.02, pp. 14–32.1–14–33 (4th ed.1980)).

■ Conclusory allegations of "alter ego" status are insufficient to state a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each. *In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d 385, 426 (S.D.N.Y. 2003) ("These purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even

under the liberal notice pleading standard"); *Wady v. Provident Life and Accident Ins. Co. of America,* 216 F.Supp.2d 1060, 1067 (C.D.Cal.2002) ("More pertinent for purposes of the current discussion, none [of the allegations] contains any reference to UnumProvident being the alter ego of Provident. None alleges that UnumProvident treats the assets of Provident as its own, that it commingles funds with Provident, that it controls the finances of Provident, that it shares officers or directors with Provident, that Provident is undercapitalized, or that the separateness of the subsidiary has ceased. Without such allegations, the issue is not adequately raised, and UnumProvident was not put on notice that this was a theory against which it should be prepared to defend"); *Kingdom 5–KR–41, Ltd. v. Star Cruises PLC,* No. 01 Civ. 2946(AGS), 2002 WL 432390, * 12 (S.D.N.Y. Mar.20, 2002) ("[I]n order to overcome the presumption of separateness afforded to related corporations, [plaintiff] is required to plead more specific facts supporting its claims, not mere conclusory allegations"); *Hokama v. E.F. Hutton & Co., Inc.,* 566 F.Supp. 636, 647 (C.D.Cal.1983) ("Defendants further argue that plaintiffs cannot circumvent the requirements for secondary liability by blandly alleging that Madgett, Consolidated, and Frane are 'alter egos' of other defendants accused of committing primary violations. This point is well taken. . . . If plaintiffs wish to pursue such a theory of liability, they must allege the elements of the doctrine. Conclusory allegations of alter ego status such as those made in the present complaint are not sufficient").

**2. Whether The Complaint Sufficiently Alleges Liability Against Comerica**

■ Comerica does not dispute that the complaint adequately alleges the first element of alter ego liability—unity of interest or ownership. Rather, it asserts

that the pleading fails adequately to allege that plaintiffs will suffer cognizable injustice if the court treats Imperial Management's acts as the acts of that entity alone. The third amended complaint plainly alleges that an inequitable result will follow if Imperial Management's acts are treated as its acts alone. It states: "[B]ecause Imperial Management is a mere instrumentality of Comerica Bank–California, an inequitable result would occur if Comerica Bank–California is not a defendant in this action." [60] The complaint fails to allege facts supporting this statement, however.

Plaintiffs assert that the failure to join Comerica would be inequitable because Imperial Management does not have sufficient assets to pay the liabilities it will incur if plaintiffs prevail at trial. California courts have rejected the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable result that warrants application of the alter ego doctrine. *Virtualmagic Asia, Inc. v. Fil–Cartoons, Inc.*, 99 Cal.App.4th 228, 245, 121 Cal.Rptr.2d 1 (2002) ("[A]lter ego will not be applied absent evidence that an injustice would result from the recognition of separate corporate identities, and '[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy this standard,'" quoting *Sonora Diamond Corp., supra*, 83 Cal.App.4th at 539, 99 Cal.Rptr.2d 824); *Mid–Century Ins. Co. v. Gardner*, 9 Cal.

App.4th 1205, 1213, 11 Cal.Rptr.2d 918 (1992) ("'Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced,' and thus set up such an unhappy circumstance as proof of an 'inequitable result. In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor,'" quoting *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 842, 26 Cal. Rptr. 806 (1962)). Rather, California courts generally require some evidence of bad faith conduct on the part of defendants before concluding that an inequitable result justifies an alter ego finding. *Mid–Century Ins. Co., supra*, 9 Cal.App.4th at 1213, 11 Cal.Rptr.2d 918 ("'The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil,'" quoting *Associated Vendors, supra*, 210 Cal.App.2d at 842, 26 Cal.Rptr. 806).

Here, the complaint fails to allege that Comerica engaged in any bad faith conduct in its acquisition and/or management of Imperial. While plaintiffs cite several cases in which the corporate veil was pierced due to the inadequate initial capitalization of an entity,[61] or the draining of

---

**60.** *Id.*, ¶ 29.

**61.** See, e.g., *Slottow v. American Cas. Co. of Reading, Pennsylvania,* 10 F.3d 1355, 1360 (9th Cir.1993) ("FNT's initial capitalization of $500,000 was woefully inadequate for a corporation that handled trust agreements of the magnitude involved here. The investors claimed damages in the range of $10,000,000; the case settled for nearly half that. Under California law, inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for acts of the subsidiary"); *Automotriz Del Golfo De California S.A. De C.V. v. Resnick,* 47 Cal.2d 792,

797, 306 P.2d 1 (1957) ("If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability.... [E]ven if the court believed defendants' testimony in this regard, it could have inferred that $5,000 was an insufficient capital investment in view of the volume of business conducted"); *United States v. Healthwin–Midtown Convalescent Hospital and Rehabilitation Center, Inc.,* 511 F.Supp. 416, 419 (C.D.Cal.1981) ("Zide himself testified that

corporate assets after initial capitalization,[62] the complaint does not allege that Comerica is guilty of either practice. Comerica was not involved in the incorporation of Imperial Management, and thus cannot be held liable for any initial undercapitalization of the company. Additionally, the complaint does not allege that Comerica deliberately drained Imperial Management of assets. Rather, plaintiffs allege only that Imperial does not presently have sufficient funds to pay a money judgment in this case. This is not adequate under California law to allege that an inequitable result will follow if the corporate veil is not pierced. Accordingly, the court finds that plaintiffs have failed adequately to allege that Comerica is liable as the alter ego of Imperial Management. Since the complaint does not sufficiently allege Comerica's liability on an alter ego theory, the claims against it must be dismissed. Moreover, since plaintiffs have had three opportunities to state claims against Comerica, the dismissal will be with prejudice.

### D. Whether The Complaint Adequately Pleads Aiding And Abetting

■ Plaintiffs' first and second claims for relief plead the aiding and abetting of a breach of fiduciary duty and the aiding and abetting of fraud respectively. Under California law, "[l]iability may ... be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." See *Fiol v. Doellstedt*, 50 Cal.App.4th 1318, 1325–26, 58 Cal. Rptr.2d 308 (1996) (citing *Saunders v. Superior Court*, 27 Cal.App.4th 832, 846, 33 Cal.Rptr.2d 438 (1994), and REST. 2D TORTS, § 876).

Plaintiffs' aiding and abetting claims are brought against all defendants. Defendants collectively mount four attacks on the claims: (1) that the complaint fails adequately to plead that defendants knew of Slatkin's fraudulent scheme; (2) that it fails to plead defendants acted for financial gain as required by California law; (3) that it fails to allege substantial assistance by defendant Leider; and (4) that it fails to allege Leider owed plaintiffs an independent fiduciary duty. The court evaluates each argument in turn.

### 1. Whether The Complaint Adequately Pleads "Knowledge"

Defendants argue that plaintiffs' aiding and abetting claims are deficient because they fail adequately to allege that defendants had actual knowledge of Slatkin's fraudulent activities. In the first amended complaint, plaintiffs alleged that the Banks "knew or should have known" of Slatkin's fraud. The court found such an allegation insufficient because California law requires

---

the corporation was undercapitalized. This testimony was confirmed by further evidence which established that although Healthwin consistently had outstanding liabilities in excess of $150,000, its initial capitalization was only $10,000"); *Linco Services, Inc. v. DuPont*, 239 Cal.App.2d 841, 844, 49 Cal.Rptr. 196 (1966) ("DuPont's participation did enable defendant corporation to return to active business, without capital stock and with inadequate financing. This resumption, in turn, invited the public generally to deal with the unsound corporation, and plaintiff did so to its loss").

**62.** *RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543, 546 (9th Cir.1985) ("TEKA transferred all of its software and licenses to Lab–Con for no consideration. Following the transfer, TEKA was simply an empty shell, which the district court properly disregarded").

that a defendant have actual knowledge of tortious activity before it can be held liable as an aider and abettor, and federal courts have found that the phrase "knew or should have known" does not plead actual knowledge. The aiding and abetting claims were thus dismissed with leave to amend. Consistent with the court's earlier order, the third amended complaint deletes all references to defendants' constructive knowledge. It asserts, for example, that

> "Pacific Inland and Imperial knew that Slatkin was in fact engaged in actions amounting to fraud and breach of his fiduciary duty to all Class Members." [63]
> "Each Bank, in its own right or through its predecessor in interest, actively participated in Slatkin's Ponzi scheme with actual knowledge of Slatkin's crimes." [64]
> "The Banks knew that Slatkin was violating his fiduciary duties to his clients and the Club and actively participated in his operation of the Ponzi scheme." [65]
> "The Banks knew that Slatkin was engaging in fraud." [66]
> "Ms. Leider knew that Slatkin was breaching fiduciary duties he owed to Club members and committing fraud." [67]

Defendants contend these allegations do not cure the earlier deficiency, because they fail to allege actual knowledge of the underlying wrong Slatkin committed. Plaintiffs counter (1) that it is not necessary to plead actual knowledge of a specific underlying wrong; and (2) that even if such an allegation is required, the complaint adequately pleads actual knowledge of specific tortious conduct on Slatkin's part.

Under Rule 9(b) of the Federal Rules of Civil Procedure, while fraud must be pled with specificity, "[m]alice, intent,

knowledge, and other condition of mind of a person may be averred generally." FED.R.CIV.PROC. 9(b). Although this obviates the necessity of pleading detailed facts supporting allegations of knowledge, it does not relieve a pleader of the burden of alleging the nature of the knowledge a defendant purportedly possessed. In the case of an aider and abettor under California law, this must be actual knowledge of the primary violation. *Howard v. Superior Court,* 2 Cal.App.4th 745, 749, 3 Cal. Rptr.2d 575 (1992) ("while aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a *conscious decision* to participate in tortious activity for the purpose of assisting another in performing a wrongful act" (emphasis added)); *Gerard v. Ross,* 204 Cal.App.3d 968, 983, 251 Cal.Rptr. 604 (1988) ("A defendant can be held liable as a cotortfeasor on the basis of acting in concert only if he or she *knew* that a tort had been, or was to be, committed, and acted with the intent of facilitating the commission of that tort"). See also *Cope v. Price Waterhouse,* 990 F.2d 1256, 1993 WL 102598, * 6 (9th Cir. Apr.7, 1993) (Unpub.Disp.) ("In a case of secondary liability for common law fraud, the California Supreme Court held that '[t]he words "aid and abet" ... have a well understood meaning, and may fairly be construed to imply an intentional participation with knowledge of the object to be attained.' ... The Second Restatement of Torts also supports a finding that actual knowledge is the proper standard for a claim of aiding and abetting fraud. Section 876(b) provides for secondary liability for tortious conduct if a party 'knows that the other's conduct constitutes a breach of

---

63. First Amended Complaint, ¶ 76.

64. *Id.,* ¶ 101.

65. *Id.,* ¶ 124.

66. *Id.,* ¶ 128.

67. *Id.,* ¶ 72.

duty and gives substantial assistance or encouragement to the other so to conduct himself.' ... Other subsections indicate that the term 'knows' does not include both actual knowledge and recklessness. When the drafters of the Restatement meant to include recklessness as an element of liability, they did so explicitly"); *Resolution Trust Corp. v. Rowe,* No. C 90–20114 BAC, 1993 WL 183512, * 5 (N.D.Cal. Feb.8, 1993) ("Under California law, actual knowledge and intent are required to impose aiding and abetting liability," citing *Gerard, supra,* 204 Cal.App.3d at 983, 251 Cal.Rptr. 604); *Hashimoto v. Clark,* 264 B.R. 585, 598 (D.Ariz.2001) (holding under California law that "[t]he requisite degree of knowledge for an aiding and abetting claim is actual knowledge. This means Trustee must come forward with evidence to show that Safrabank knew Clark was breaching a duty owed Sheffield").

The question is whether plaintiffs' allegations satisfy this standard. Generally, courts have found pleadings sufficient if they allege generally that defendants had actual knowledge of a specific primary violation. See *Dubai Islamic Bank v. Citibank, N.A.,* 256 F.Supp.2d 158, 167 (S.D.N.Y.2003) (holding that a complaint asserting that " 'Citibank, through its officers and employees, ... actually knew of and participated in the unlawful scheme to steal from DIB and launder the money stolen from DIB' ... sufficiently allege[d] that Citibank had actual knowledge"); *In re Sharp Intern. Corp.,* 281 B.R. 506, 513 (Bankr.E.D.N.Y.2002) ("To analyze the sufficiency of Sharp's pleading, it is necessary to identify precisely the breach of fiduciary duty for which Sharp seeks to hold State Street liable ... Sharp's pleading falls short of alleging that State Street had actual knowledge of the Spitzes' diversion of monies from Sharp"); *Bogart v. National Community Banks, Inc.,* Civ. A. No. 90–5032, 1992 WL 203788, * 8 (D.N.J. Apr.25, 1992) (holding that plaintiff had adequately pleaded the actual knowledge element of an aiding and abetting claim because "Rule 9(b) clearly provides that 'intent, knowledge, and other condition of mind of a person may be averred generally.' ... Rule 9(b) is satisfied where plaintiff 'alleges generally that defendants had actual knowledge of the materially false and misleading statements and omissions ... or acted with reckless disregard for the truth.' ... Plaintiff has met this standard"); *Smith v. Network Equipment Technologies, Inc.,* Nos. C–90–1138 DLJ, C–90–1281 DLJ and C–90–1372 DLJ, 1990 WL 263846, * 7 (N.D.Cal. Oct.19, 1990) (citing *In re Thortec Securities Litigation,* [1989 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 94,330, 1989 WL 67429 (N.D.Cal. 1989), for the proposition that a "general averment of actual knowledge [is] sufficient to plead a claim of aiding and abetting liability").

■ Applying this standard, the complaint adequately pleads that defendants had actual knowledge of the primary violation committed by Slatkin. The complaint asserts that the Banks knew Slatkin was committing fraud and was breaching his fiduciary duties to class members. It also alleges that each bank actively participated in Slatkin's Ponzi scheme with knowledge of his crimes. Slatkin's crime, of course, was the operation of a Ponzi scheme that defrauded hundreds of investors and caused losses of hundreds of millions of dollars. The complaint details the manner in which the Ponzi scheme operated, describes Slatkin's fraudulent transactions, and outlines the Banks' involvement in these activities. It alleges, in particular, that the Banks utilized atypical banking procedures to service Slatkin's accounts, raising an inference that they knew of the Ponzi scheme and sought to accommodate it by altering their normal ways of doing business. This supports the general allegations of knowledge. See, e.g., *Aetna*

*Casualty and Surety Co. v. Leahey Construction Co.,* 219 F.3d 519, 536 (6th Cir. 2000) ("... although short-term lending may be 'commonplace,' the details of this particular loan (e.g., its four-day duration straddling the July 1996 month end) were highly unusual"); *Camp v. Dema,* 948 F.2d 455, 459 (8th Cir.1991) ("A party who engages in atypical business transactions or actions which lack business justification may be found liable as an aider and abettor with a minimal showing of knowledge," citing *Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1010 (11th Cir. 1985)); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975) ("Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability"). While it is true the complaint does not directly state that the Banks knew Slatkin was running a Ponzi scheme and stealing investor funds, this is the net effect of allegations that the Banks knew of Slatkin's "fraud," "actively participated" in the Ponzi scheme with knowledge of his "crimes," and accommodated him by using atypical banking procedures to service his accounts.

The Banks argue that the pleading is insufficient because multiple types of "fraud" are alleged in the complaint. "Crimes," they assert, could refer to Slatkin's failure to register as an investment advisor or to his overdrawing of accounts, both of which are alleged in the complaint.

To the extent this is the reference, the Banks maintain, the allegations are wholly insufficient, as plaintiffs do not allege that they have suffered damage as a result of these misdeeds on Slatkin's part.[68] The complaint, however, references "crimes" in the context of an allegation that directly concerns Slatkin's Ponzi scheme, and asserts the Banks actively participated in it. Read liberally, as it must be for purposes of a Rule 12(b)(6) motion, this allegation pleads that the Banks knew of the Ponzi scheme. See *Aetna Casualty and Surety Co., supra,* 219 F.3d at 533–34 ("If one is aware that he has a role in an improper activity, ... then surely he knows that the primary party's conduct is tortious"). The Banks' reading to the contrary seeks to parse the pleading too finely for Rule 8 purposes.

This is particularly true when one considers the detail with which Slatkin's underlying wrong and the Banks' substantial assistance is pled. See, e.g., *Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452, 494 (S.D.N.Y.2001) ("To satisfy the knowledge requirement of these claims, New York law requires that a defendant have 'actual knowledge' of the underlying fraud. ... The defendant's knowledge and intent, however, need only be 'averred generally.' ... A plaintiff satisfies the scienter pleading requirement where it identifies 'circumstances indicating conscious behavior by the defendant,' ... or a clear opportunity and a motive to aid the fraud"). Defendants cite no cases to the contrary.[69]

**68.** Defendants assert that plaintiffs simply replaced allegations found in their earlier complaint that the Banks "knew or should have known" of various of Slatkin's activities with allegations of knowledge in this complaint. They find it suspicious that virtually all of the relevant allegations were amended in this fashion except one asserting that the Banks knew or should have known of Slatkin's Ponzi scheme, and make much of the fact that the current complaint contains no allegation that the Banks knew of the scheme. While the

Banks' belief that plaintiffs cannot show actual knowledge may ultimately prove to be true, the allegation that the Banks "actively participated in Slatkin's Ponzi scheme with actual knowledge of his crimes" suffices to allege their knowledge of the Ponzi scheme.

**69.** Defendants rely heavily on *In re Sharp Intern. Corp., supra,* 281 B.R. 506, which dismissed an aiding and abetting claim for failure to plead the underlying breach of fiduciary duty specifically. *Sharp* is distinguish-

Accordingly, the court finds that the complaint adequately pleads the Banks' actual knowledge of Slatkin's underlying fraud, and denies their motion to dismiss the aiding and abetting claims on this basis.[70]

### 2. Whether The Complaint Adequately Pleads "Financial Gain"

The Banks next argue that the claim for aiding and abetting a breach of fiduciary duty fails because it does not adequately plead that they participated in the breach for financial gain or advantage. California courts have generally held that, to hold a non-fiduciary liable for aiding and abetting a fiduciary's breach of his duties, the non-fiduciary must have participated in the breach for personal gain or in furtherance of its own financial advantage. See *Doctors' Co. v. Superior Court,* 49 Cal.3d 39, 47, 260 Cal.Rptr. 183, 775 P.2d 508 (1989).

In the first amended complaint, plaintiffs alleged that the Banks acted for their own financial advantage because they received substantial fees from Slatkin and his investors. The court found that this did not adequately plead financial gain, citing the fact that California courts uniformly hold that ordinary fees, even fees calculated on the basis of the amount of assets held in an account, do not satisfy the "personal gain or financial advantage" requirement. Consistent with the court's order, plaintiffs amended the complaint to allege new facts regarding the financial

---

able, as there, the complaint as a whole failed to allege the nature of the underlying wrong. Here, by contrast, the complaint clearly sets forth the nature of the underlying wrong.

**70.** Defendants argued at the hearing that even if the complaint adequately alleges actual knowledge of Slatkin's defrauding of account holders, it fails to allege actual knowledge of Slatkin's defrauding of non-account holders. The court disagrees. The complaint specifically pleads that the Banks had actual knowledge of the fraudulent activities that Slatkin perpetrated on all of his clients, including non-account holders. (See Third Amended Complaint, ¶ 76) ("... Pacific Inland and Imperial knew that Slatkin was in fact engaged in actions amounting to fraud and breach of his fiduciary duty to *all Class Members* " (emphasis added)); *id.,* ¶ 124 ("The Banks knew that Slatkin was violating his fiduciary duties to *his clients* and the Club and actively participated in his operation of the Ponzi scheme" (emphasis added)). Moreover, the complaint alleges that the Banks had knowledge of Slatkin's Ponzi scheme. *Id.,* ¶ 101 ("Each Bank, in its own right or through its predecessor in interest, actively participated in Slatkin's Ponzi scheme with actual knowledge of Slatkin's crimes"). Since the Ponzi scheme allegedly encompassed both account holders and non-account holders, the allegations in combination sufficiently plead knowledge of Slatkin's defrauding of non-account holders. Cf. *LaSalle Nat. Bank v. Duff & Phelps Credit Rating*

*Co.,* 951 F.Supp. 1071, 1093 (S.D.N.Y.1996) ("[T]he complaint alleges that Duff & Phelps participated in Towers' Ponzi scheme by assigning the inflated rating of 'AA' (or 'AA+') to the Bonds. . . . Duff & Phelps argues that plaintiffs' claim fails because plaintiffs have not alleged that Duff & Phelps had knowledge of the identity of each individual purchaser. . . . Knowledge of the identity of each particular plaintiff is not necessary, however, if the defendant's representation is designed to target a 'select group of qualified investors' rather than 'the public at large.' . . . Plaintiffs have adequately alleged that Duff & Phelps knew that a select group of qualified investors would rely on the inaccurate rating contained in the Offering Memoranda. Duff & Phelps expressly consented to the use of its Bond rating in the Offering Memoranda. Moreover, Duff & Phelps was in direct contact with at least some of the plaintiffs, and with the broker dealers selling the Bonds. Thus, Duff & Phelps knew that its misrepresentations were being circulated in a private placement memoranda to a select group of potential investors," quoting *Schwartz v. Michaels,* No. 91 CIV. 3538(RPP), 1992 WL 184527, * 32 (S.D.N.Y. July 23, 1992)). While it may ultimately prove to be the case that the Banks did not know Slatkin had investors other than the account holders, the court must, for purposes of this motion, accept as true the allegations to the contrary contained in plaintiffs' third amended complaint.

gain defendants obtained through their dealings with Slatkin. Defendants assert that these new allegations remain inadequate.

Plaintiffs counter (1) that financial gain is not a required element for aiding and abetting liability under California law;[71] (2) that the complaint nonetheless adequately alleges conduct by the Banks in furtherance of their own financial advantage; and (3) that the bribes Slatkin allegedly paid to Leider are properly imputed to the Banks under the doctrine of respondeat superior, and constitute financial gain.

Plaintiffs argue first that financial gain is not a required element of all aiding and abetting claims. Rather, they assert that the need to plead and prove financial gain arises only in cases alleging wrongful conduct by an agent or employee of a fiduciary. Additionally, they maintain that including financial gain as an element of aiding and abetting a breach of fiduciary duty confuses that tort with conspiracy. Finally, plaintiffs contend that, because California has adopted the Restatement definition of aiding and abetting, which does not include a "financial gain" requirement, it is not an element of the tort. The court evaluates each argument in turn.

■ Plaintiffs first argue that the financial gain requirement constitutes an exception to the agent's immunity rule, and thus does not apply where the defendant is not an agent of the party responsible for the underlying harm. The agent's immunity rule provides that duly acting agents and employees cannot be held liable for conspiring with their principals. *Doctors' Co., supra,* 49 Cal.3d at 45, 260 Cal.Rptr. 183, 775 P.2d 508 ("This rule ... 'derives from the principle that ordinarily corporate agents and employees acting for and on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract since being in a confidential relationship to the corporation their action in this respect is privileged,'" quoting *Wise v. Southern Pacific Co.,* 223 Cal. App.2d 50, 72, 35 Cal.Rptr. 652 (1963)).

■ The rule does not apply where the agent acts for his or her own financial gain. See *id.* at 47, 260 Cal.Rptr. 183, 775

**71.** Plaintiffs' opposition to defendants' earlier motions to dismiss did not dispute that they were required to plead financial gain to state an aiding and abetting claim against a nonfiduciary under California law, and the court so held in its prior order. Plaintiffs' present assertion that financial gain is not an element of the tort essentially seeks reconsideration of the earlier ruling. Plaintiffs have not made a proper motion for reconsideration, nor have they shown that they are entitled to reconsideration. Before reconsideration is appropriate, a party must demonstrate

"(a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the

Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." CA CD L.R. 7–18.

Plaintiffs have not shown a material difference in law or fact, the emergence of new law or facts, or a manifest failure by the court to consider material facts presented by plaintiffs, and the court could properly refuse to consider plaintiffs' new arguments as a consequence. To ensure that its initial decision was not infected by error as a result of plaintiffs' failure to raise the issue, however, the court has elected to address the argument on the merits. See also *School Dist. No. 1J, Multnomah County v. ACandS Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993) ("reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law").

P.2d 508 (the rule "does not preclude the subjection of agents to conspiracy liability for conduct which the agents carry out 'as individuals for their individual advantage' and not solely on behalf of the principal. . . . Since the nonfiduciary defendants . . . acted not simply as agents or employees of the fiduciary defendants but rather in furtherance of their own financial gain, they could not have been relieved from liability under the [agent's immunity rule]"). See also *Skarbrevik v. Cohen, England & Whitfield*, 231 Cal.App.3d 692, 710, 282 Cal.Rptr. 627 (1991) (applying *Doctors' Co.* to reverse a verdict against an attorney where the facts at trial established that the attorney received no more than ordinary fees for legal work performed for the client company); *Wolf v. Mitchell, Silberberg & Knupp*, 76 Cal. App.4th 1030, 1040, 90 Cal.Rptr.2d 792 (1999) (holding that a beneficiary had standing to sue a trustee's attorneys where the attorneys were alleged to have actively concealed the dissipation of trust assets in order to keep receiving a greater amount of the fees than they would have otherwise); *Pierce v. Lyman*, 1 Cal.App.4th 1093, 1104–06, 3 Cal.Rptr.2d 236 (1991) (applying *Doctors' Co.* to reverse the dismissal of a complaint on demurrer where the complaint alleged that attorneys for a trust had engaged in misrepresentations, concealment and self-dealing for personal financial gain).

The question is whether these cases, which clearly applied the financial gain requirement as an exception to the agent's immunity rule, mandate a finding that it is properly applied only in that context. None expressly limits the requirement in this manner. Plaintiffs assert, however, that *1–800 Contacts, Inc. v. Steinberg*, 107 Cal.App.4th 568, 132 Cal.Rptr.2d 789 (2003), and *Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI*, 100 Cal.App.4th 1102, 123 Cal.Rptr.2d 297 (2002), support their argument in this re-

gard. Both *1–800 Contacts* and *Everest Investors* are conspiracy cases, which based their holdings ultimately on the fact that defendants did not owe plaintiffs an independent duty and thus could not conspire to breach that duty. See *1–800 Contacts, supra*, 107 Cal.App.4th at 592–93, 132 Cal.Rptr.2d 789 ("Breach of fiduciary duty is a tort that by definition may be committed by only a limited class of persons. . . . In the case of Conder's fiduciary duty to plaintiff as its former attorney, that class did not include Steinberg. Plaintiff's effort to hold him nevertheless liable for Conder's alleged breach through the doctrine of conspiracy was legally unauthorized"); *Everest Investors, supra*, 100 Cal.App.4th at 1107–08, 123 Cal. Rptr.2d 297 ("Since the only duty allegedly breached as a result of the alleged conspiracy is a fiduciary duty owed by the General Partners but not by Whitehall, Whitehall cannot be held accountable to Everest on a conspiracy theory").

In reaching this result, both the *1–800 Contacts* and the *Everest Investors* courts took pains to note that the "financial gain" requirement is an exception to the agent's immunity rule and, in the context of a claim for conspiracy, cannot substitute for or create a duty where none otherwise exists. Both cited the "two independent principles" on which *Doctors' Co.* was based—the fact that parties cannot be liable for conspiring to breach a duty they do not owe and the agent's immunity rule, and noted that the exception for conduct undertaken for one's own financial gain applies only to the agent's immunity rule. See *1–800 Contacts, supra*, 107 Cal. App.4th at 592, 132 Cal.Rptr.2d 789; *Everest Investors, supra*, 100 Cal.App.4th at 1107–08, 1109, 123 Cal.Rptr.2d 297.

Each of *1–800 Contacts* and *Everest Investors* criticizes earlier California appellate decisions holding that agents of fiduciaries who act to further their own fi-

nancial interests can be held liable for conspiring to breach or for aiding and abetting a fiduciary's breach of duty. Among the decisions criticized are those on which the court earlier relied in holding that plaintiffs had to plead that the Banks acted for their own financial gain—*Pierce, supra,* 1 Cal.App.4th 1093, 3 Cal.Rptr.2d 236, and *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 80 Cal. Rptr.2d 329 (1998). See *Everest Investors, supra,* 100 Cal.App.4th at 1108–09, 123 Cal.Rptr.2d 297. See also· *1–800 Contacts, supra,* 107 Cal.App.4th at 592, 132 Cal.Rptr.2d 789.

The *Pierce* court held that *Doctors' Co.* stated two exceptions to the rule that one cannot conspire to breach a duty he or she does not owe. The first of these, the court said, is where the party owes an independent duty to the plaintiff; the second, it held, is where a party participates in the breach of another's duty for his or her own financial gain. See *Pierce, supra,* 1 Cal. App.4th at 1104–05, 3 Cal.Rptr.2d 236 ("*Doctors' Co.* . . . cited several exceptions to this rule. Most notably, where an attorney conspires with a client to violate a statutory duty peculiar to the client, the attorney may be liable for his or her participation in the violation of the duty if the attorney was acting in furtherance of his or her own financial gain. . . . Also to be distinguished is the case where an attorney violates his or her own duty to the plaintiff. . ."). Concluding that the complaint adequately alleged that the attorney defendants had acted for their own personal gain, the court held that it stated a claim for breach of fiduciary duty against them. *Id.* at 1105–06, 3 Cal.Rptr.2d 236.

Relying on *Pierce* and *Doctors' Co.,* the *City of Atascadero* court held that "[u]nder California law, the right to sue a third party for participating in a fiduciary's breach of trust is limited to situations in which the third party was acting for personal gain or in furtherance of his or her own financial advantage. . . . As long as the third parties were acting to further their own individual economic interests, they may be liable for actively participating in a fiduciary's breach of his or her trust." *City of Atascadero, supra,* 68 Cal. App.4th at 463, 80 Cal.Rptr.2d 329. The court discussed a recent appellate decision—*Kidron v. Movie Acquisition Corp.,* 40 Cal.App.4th 1571, 47 Cal.Rptr.2d 752 (1995)—which, citing the California Supreme Court's decision in *Applied Equipment,* held that a party not in a fiduciary relationship with the plaintiff could not be held liable for conspiring to breach a fiduciary's duty to the plaintiff. *City of Atascadero, supra,* 68 Cal.App.4th at 464, n. 14, 80 Cal.Rptr.2d 329. The *Atascadero* court concluded that *Kidron* had overlooked the exception to this general rule created by *Doctors' Co.* for cases where the non-fiduciary acts for his or her own financial gain, and stated that non-fiduciaries could be held liable for aiding and abetting a breach of fiduciary duty where they acted for individual advantage. *Id.*[72]

As this brief summary of the cases makes clear, there appears to be a clear division among the California Courts of Appeal regarding the proper interpretation of the California Supreme Court's decisions in *Doctors' Co.* and *Applied Equipment.* The court must thus attempt to discern how the Supreme Court would itself decide the issue in the context of this case. See *Katz v. Children's Hosp. of Orange County,* 28 F.3d 1520, 1528 (9th Cir.1994) ("Our task is to predict how the

---

**72.** *Pierce* and *City of Atascadero* were followed in *Wolf, supra,* 76 Cal.App.4th 1030, 90 Cal.Rptr.2d 792.

California Supreme Court would interpret section 340.5"); *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir.1982) (determining which of several conflicting intermediate state court decisions the state supreme court would adopt).

The court first notes that *Pierce, City of Atascadero,* and *Wolf* each applied section 326 of the Restatement (Second) of Trusts, which provides that "[a] third person who, although not a transferee of trust property, has notice that the trustee is committing a breach of trust and participates therein is liable to the beneficiary for any loss caused by the breach of trust." While the holdings of the cases regarding breach of fiduciary duty are broader, it appears they were informed by the particular trust context in which the cases arose, as each court attempted to harmonize the common law trust principles reflected in the Restatement with the California Supreme Court's pronouncements in *Doctors' Co.* See *Wolf, supra,* 76 Cal.App.4th at 1039–40, 90 Cal.Rptr.2d 792 (addressing a complaint that alleged a claim for active participation in a trustee's breach of trust); *City of Atascadero, supra,* 68 Cal.App.4th at 463–64, 80 Cal.Rptr.2d 329 (stating that the common law rule set forth in the Restatement was limited by *Doctors' Co.,* but that the "basic principles" remained the same); *Pierce, supra,* 1 Cal.App.4th at 1103–04, 3 Cal.Rptr.2d 236 (discussing § 326 and stating that "[t]he right to sue attorneys, agents, or employees of a fiduciary for participation in the fiduciary's breach of trust has been circumscribed by the California Supreme Court in *Doctors' Co. . . .* ").[73] Perhaps because of the trust context in which they arise, and the nonspecific language of the Restatement section they apply,[74] the cases do not clearly distinguish between claims for breach of fiduciary duty, conspiracy to breach a fiduciary duty, and aiding and abetting the breach of a fiduciary duty. The instant case does not involve a breach of fiduciary duty by a trustee.[75] Thus, to the extent *Pierce* and *City of Atascadero* were informed by the common law of trusts, and blurred the distinction between conspiracy and aiding and abetting liability as a result, they are inapposite to this case.

*1–800 Contacts* and *Everest Investors,* while conspiracy cases, address the applicability of the financial gain requirement outside the trust context. More fundamentally, these courts' interpretation of the *Doctors' Co.* and *Applied Equipment* decisions is correct. Both *Doctors' Co.* and *Applied Equipment* are conspiracy cases. The starting point for their analysis is the principle that a civil conspiracy is not an independent tort and gives rise to a cause of action only when a civil wrong has been committed that results in damage. See *Applied Equipment, supra,* 7 Cal.4th at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454; *Doctors' Co., supra,* 49 Cal.3d at 44, 260

**73.** *Mosier v. Southern California Physicians Ins. Exchange,* 63 Cal.App.4th 1022, 1048, 74 Cal.Rptr.2d 550 (1998), did not arise in the trust context. There, the court stated: "We agree with SCPIE that the general rule is that a party who is not personally bound by the duty violated may not be held liable for civil conspiracy even though it may have participated in the agreement underlying the injury. . . . However, an exception to this rule exists when the participant acts in furtherance of its own financial gain." *Id.* at 1048, 74 Cal.Rptr.2d 550. In reality, the court had already found that the insurer, SCPIE, had a duty to the plaintiff. *Id.* Thus, this statement was not necessary to the court's decision and is dicta.

**74.** The Restatement speaks of "participation" in a breach of trust, rather than "conspiracy" or "aiding and abetting."

**75.** While Slatkin was an investment advisor, there is no indication that he operated pursuant to a statutory or other species of trust. This distinguishes the case from *City of Atascadero,* which involved statutory investment trusts.

Cal.Rptr. 183, 775 P.2d 508. Both cases articulate the doctrine that a conspiracy claim may not be asserted against one who did not owe the injured party a duty. *Applied Equipment, supra,* 7 Cal.4th at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454; *Doctors' Co., supra,* 49 Cal.3d at 44, 260 Cal.Rptr. 183, 775 P.2d 508. While *Doctors' Co.* also relied on the agent's immunity rule, and discussed the financial gain exception to that rule (see 49 Cal.3d at 44, 260 Cal.Rptr. 183, 775 P.2d 508), the Supreme Court in *Applied Equipment* made clear that this issue was "independent" from the question of duty. To the extent, therefore, that *Pierce* and *City of Atascadero* read *Doctors' Co.* as permitting a conspiracy cause of action to proceed against a party who does not owe plaintiff a duty solely because the party acted for his or her own financial gain, the court concludes that they are incorrectly decided, and that the California Supreme Court would so hold.

This does not resolve the precise question that is presently before the court, however, as plaintiffs do not charge the Banks with conspiracy, but rather with aiding and abetting the breach of a fiduciary duty. Under California law, such a cause of action does not require that the aider and abettor owe plaintiff a duty so long as it knows the primary wrongdoer's conduct constitutes a breach of duty, and it substantially assists that breach of duty. See *Fiol, supra,* 50 Cal.App.4th at 1325–26, 58 Cal.Rptr.2d 308. Other than the

*Pierce/City of Atascadero/Wolf* line of cases, the only case cited by either party that even remotely suggests that financial gain is an element of a claim for aiding and abetting the breach of a fiduciary duty is *Heckmann v. Ahmanson,* 168 Cal.App.3d 119, 214 Cal.Rptr. 177 (1985).[76] There, the court stated:

> "If the Disney directors breached their fiduciary duty to the stockholders, the Steinberg Group could be held jointly liable as an aider and abettor. The Steinberg Group knew it was reselling its stock at a price considerably above market value to enable the Disney directors to retain control of the corporation. It knew or should have known Disney was borrowing the $325 million purchase price. From its previous dealings with Disney, including the Arvida transaction, it knew the increased debt load would adversely affect Disney's credit rating and the price of its stock. If it were an active participant in the breach of duty *and reaped the benefit,* it cannot disclaim the burden." *Id.* at 127, 214 Cal.Rptr. 177 (emphasis added).

Having reviewed *Heckmann* carefully, the court concludes that it stands for the unremarkable proposition that one who knows of a fiduciary's breach of duty and substantially assists it is liable as an aider and abettor. The court's reference to "reaping the benefit," offhand as it is, cannot be seen as adding an element to the tort.[77]

Rather, the *Heckmann* court cited financial gain as evidence that the aider and

---

**76.** Defendants contend that the Supreme Court's decision in *Bancroft–Whitney Co. v. Glen,* 64 Cal.2d 327, 49 Cal.Rptr. 825, 411 P.2d 921 (1966), imposed such a requirement. See *id.* at 353, 49 Cal.Rptr. 825, 411 P.2d 921 ("It is clear from the evidence set forth above that Bender was aware of or ratified Glen's breach of his fiduciary duties in all but a few respects, that he cooperated with Glen in the breach, and that he received the benefits of Glen's infidelity. It cannot be said here ... that Bender Co. did not 'reap where it had

not sown.' Under all the circumstances, Bender and Bender Co. must be held liable for their part in Glen's breach of his fiduciary duties"). *Bancroft–Whitney* does not aid defendants' argument, as the claim there considered was an unfair competition claim, not an aiding and abetting claim. See *id.* at 330, 49 Cal.Rptr. 825, 411 P.2d 921.

**77.** It should be noted, moreover, that the aider and abettor in *Heckmann* itself had a duty to shareholder plaintiffs, such that the second

abettor knew of and substantially assisted the primary violator's breach of fiduciary duty. A review of the case law and scholarly literature regarding the tort indicates that this is the proper role to assign to financial gain, i.e., it should not be viewed as an element of the tort, but as evidence of knowledge, substantial assistance, or both. See Alan R. Bromberg & Lewis D. Lowenfels, Aiding and Abetting Securities Fraud: A Critical Examination, 52 ALB. L. REV. 637, 739–48 (1988) ("Benefit or gain derived by the aider-abettor is not one of the three traditional elements of aiding-abetting—primary violation, knowledge, and substantial assistance. Benefit nonetheless has significance in aid-abet cases. The courts mention it with some frequency and attach varying weight to its presence or absence in deciding whether either the knowledge or the substantial assistance requirements (or both) are satisfied"). See also *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir.1978) (" 'The requirement of knowledge may be less strict where the alleged aider and abettor derives benefits from the wrongdoing but even in this situation the proof offered must establish conscious involvement in impropriety or constructive notice of intended impropriety,' ") quoting *Gould v. American–Hawaiian Steamship Co.*, 535 F.2d 761, 780 (3d Cir.1976); *Chem-Age Industries v. Glover*, 652 N.W.2d 756, 775 (S.D.2002) ("It has been suggested that an element of wrongful intent should be included as part of the 'substantial assistance' requirement. . . . One example of wrongful intent would be when a lawyer aids and abets the breach of a fiduciary duty in furtherance of the lawyer's own self-interest. . . . Although not an element in proving aiding and abetting the breach of a fiduciary duty, certainly [a lawyer's self-interest and receipt of fees] are circumstances to consider in gauging a lawyer's alleged knowing participation and substantial assistance," citing, *inter alia*, *Skarbrevik, supra*, 231 Cal.App.3d 692, 282 Cal.Rptr. 627). Cf. Bryan C. Barksdale, Redefining Obligations in Close Corporation Fiduciary Representation: Attorney Liability for Aiding and Abetting the Breach of Fiduciary Duty in Squeeze-Outs, 58 WASH. & LEE L. REV. 551, 572–73 (2001) (describing California's financial gain requirement as a substitute for intent).[78]

prong of the *Fiol* test probably applied. See *Fiol, supra*, 50 Cal.App.4th at 1325–26, 58 Cal.Rptr.2d 308 (one is liable as an aider and abettor if he "gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person").

78. Imperial argues that, at a minimum, the court should require that plaintiffs plead and prove that the banks benefited financially from assisting Slatkin to defraud investors who were not bank customers. Imperial asserts it did not know these investors existed, and thus cannot have consciously aided and abetted Slatkin's efforts to defraud them. As noted *supra*, the complaint alleges that the Banks knew Slatkin was defrauding, and breaching his fiduciary duty to, all Class Members. The court must accept this allegation as true for purposes of ruling on defendants' motions. The court notes, however, that the Banks can have had no form of duty—fiduciary or otherwise—to investors who were not depositors. Given that the banks had no duty of any kind to this group, non-account holders should arguably be required to adduce stronger evidence that the banks knew the full extent of Slatkin's Ponzi scheme and intended to assist him in executing it than Club members who had accounts at the banks. See, e.g., *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 485 (2d Cir.1979) (" 'A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud,' " quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir.1975)). The court need not decide this issue, however, as the question is not properly

■ Accordingly, the court concludes that the California Supreme Court would not hold that personal financial gain is an element of aiding and abetting a breach of fiduciary duty. Thus, plaintiffs need not plead that the Banks, who were not Slatkin's agents, acted for their own financial gain in order to state a claim that they aided and abetted Slatkin's breach of a fiduciary duty.[79] Defendants' motion to dismiss on this basis is therefore denied.

### 3. Whether The Complaint Adequately Pleads "Substantial Assistance"

Defendant Leider argues that the complaint fails to describe how she substantially assisted Slatkin's scheme and damaged plaintiffs. In the first amended complaint, plaintiffs alleged that the Banks substantially assisted Slatkin by giving him access to large sums of money that kept his scheme afloat for a significant period of time. The court found these allegations sufficient to allege that the Banks' participation was a "substantial factor" in bringing about the alleged injury suffered by the putative class members. In the third amended complaint, plaintiffs have added allegations that Leider substantially assisted Slatkin by "vouching" for his Club and "promoting" his skills as an investment advisor.

Leider argues that these allegations do not adequately plead substantial assistance. She asserts that (1) allegations the Banks extended funds to Slatkin do not demonstrate that she substantially assisted him since it is not alleged that she gave Slatkin money; (2) the complaint contains no allegations as to how she purportedly assisted Slatkin's theft of non-account

holder investments; and (3) allegations that she "vouched" for Slatkin's investment club and "promoted" his skills as an investment advisor to account holders at Imperial and Pacific Inland Banks are not pled with the specificity required by Rule 9(b). The court evaluates each argument in turn.

Leider first argues that the court's earlier ruling that plaintiffs had adequately pled substantial assistance on the part of the Banks does not apply to her since the complaint does not allege that she gave Slatkin any funds. Plaintiffs do not dispute the absence of such an allegation. They argue, however, that "[b]ecause Ms. Leider was the administrator of the Club at both Pacific Inland and Imperial, the [first amended complaint's] allegations in large part referred to Ms. Leider's actions," and thus the "court has already held, in effect, that the ... allegations as to Ms. Leider are sufficient."

In its prior order, the court cited an allegation in the first amended complaint asserting that "access to [the] large sums of cash the Banks gave Mr. Slatkin allowed Mr. Slatkin to pay fake returns to all of his investors," and "to prolong the longevity of [the] fraud."[80] It concluded this sufficed to allege that the Banks' participation was a "substantial factor" in bringing about the injury purportedly suffered by the putative class members. See *Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452, 470 (S.D.N.Y.2001) ("Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated"); *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1052–53, 1

---

raised by the pending motions, which address only the sufficiency of the complaint.

**79.** Because it concludes that plaintiffs are not required to plead financial gain to state an

aiding and abetting claim, the court need not consider the parties' arguments regarding the adequacy of the pleading in this regard.

**80.** First Amended Complaint, ¶ 93.

Cal.Rptr.2d 913, 819 P.2d 872 (1991) (endorsing a "substantial factor" test for proximate cause). This analysis is inapposite as respects Leider, however, since neither first nor the third amended complaints alleges that she personally advanced funds to Slatkin that were used in the scheme. Thus, the adequacy of plaintiffs' allegations that she substantially assisted the scheme must be found elsewhere in the complaint.

 Leider bifurcates her discussion of this issue between account holder and non-account holder plaintiffs. As respects the latter, she argues correctly that the complaint contains no factual allegations regarding the manner in which she purportedly assisted Slatkin's theft of funds from this investor class. Rather, all of the allegations in the third amended complaint regarding Leider's conduct concern Club accounts at Pacific Inland and Imperial Management. Thus, the non-account holder plaintiffs' aiding and abetting claims against Leider fail adequately to allege

"substantial assistance," and must be dismissed with leave to amend.

Leider next contends that allegations she "vouched" for Slatkin and "promoted" his investment skills to account holders at the Banks are not pled with the requisite degree of specificity under Rule 9(b). Plaintiffs do not dispute that, when a claim alleges the aiding and abetting of a fraud, substantial assistance must be pled in accordance with Rule 9(b)'s heightened specificity requirements.[81] They maintain, however, that their allegations regarding Leider's substantial assistance of Slatkin's fraud satisfy this standard.

The complaint contains numerous allegations concerning specific activities in which Leider engaged. It states that she recruited investors to liquidate existing investments and purchase shares in Slatkin's investment club, representing to them that Slatkin could obtain high rates of return and that he was a man of great integrity. It further alleges that, in at least one instance, Leider stated that all Club assets

---

**81.** Nor could plaintiffs make such an argument. Federal courts have held that the substantial assistance prong of a claim that defendant aided and abetted the commission of a fraud must be pled with heightened specificity. *FMC Corp. v. Boesky*, 727 F.Supp. 1182, 1200–01 (N.D.Ill.1989) ("The parties[ ] dispute whether FMC has alleged its aiding and abetting claims with enough detail. Federal Rule of Civil Procedure 9(b) obligates the plaintiff 'to state each of the elements of aiding and abetting liability with sufficient particularity to give defendant[s] adequate notice of the exact nature of the fraud claimed so that [they] can formulate adequate responses. ... Unadorned allegations that [the defendants] knew of the primary violation and rendered substantial assistance ... will not suffice to satisfy the strictures of Rule 9(b),' " quoting *Kirshner v. Goldberg*, 506 F.Supp. 454, 458 (S.D.N.Y.1981), aff'd. without opinion, 742 F.2d 1430 (2d Cir.1983)); *Brant v. CCG Financial Corp.*, 693 F.Supp. 889, 894 (D.Or.1988) ("The acts or omissions that comprise the necessary substantial assistance must be pleaded with specificity pursuant to

Fed.R.Civ.P. 9(b)"); *First Federal Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 634 F.Supp. 1341, 1353 (S.D.N.Y. 1986) ("Memel Jacobs also contends that the supplemental third-party complaint is deficient because its allegations of substantial assistance violate 'the general rule that Rule 9(b) pleadings cannot be based on information and belief.' ... It is true that OAD's complaint introduces the allegations of substantial assistance in conclusory terms and on information and belief; however, this language is followed by a more specific description, quoted above, of the nature of the acts by Memel Jacobs that are alleged to constitute the substantial assistance.... Although OAD's description of Memel Jacobs' conduct is not particularly detailed, we believe it is an acceptable 'statement of facts upon which the [pleading on information and] belief is founded,' ... so as to render the pleading sufficient, at least as to matters particularly within Memel Jacobs' knowledge, such as its dealings with Comark.... Dismissal on Rule 9(b) grounds is therefore not warranted" (citations omitted)).

were marketable securities and that certificates would be held in the bank vault.[82]

Plaintiffs assert that Leider "unitized" shares of the Club, and told investors the Club was regularly audited. They also contend that when Slatkin was slow to honor withdrawal requests, Leider explained to investors why it was taking longer than expected to obtain the funds.[83] Finally, they allege that Leider falsely told investors the Banks deducted fees from liquid assets on deposit.[84]

Leider argues that these allegations do not sufficiently plead substantial assistance because plaintiffs do not specifically identify the individuals to whom she allegedly spoke, when she made the statements, and what she said.[85] In assessing this argument, it is important to recall that Leider is not charged directly with fraud. Rather, she is charged with "substantially assisting" Slatkin's fraud. Where aiding and abetting is the gravamen of the claim, Rule 9(b) requires that "the complaint . . . inform [the] defendant . . . what he did that constituted . . . 'substantial assistance.'" *Graziose v. American Home Products Corp.*, 202 F.R.D. 638, 642 (D.Nev.2001) (quoting *Arroyo v. Wheat*, 591 F.Supp. 136, 138–39 (D.Nev.1984)). See also *Securities and Exchange Commission v. Wexler*, No. 92 Civ. 2902(SWK), 1993 WL 362390, * 4 (S.D.N.Y. Sept.14, 1993) (finding that a complaint, which alleged that defendant complied with instructions not to accept unapproved sell orders and parked 3,000 units in a nominee account, adequately alleged substantial assistance because the "allegations [were] sufficiently specific to inform [the defen-

dant] of the precise nature of the charges levied against him"); *National Fire Ins. Co. of Pittsburgh, Pa. v. Califinvest*, Nos. 90 CIV. 2476(LLS), 90 CIV. 6831(LLS), 1992 WL 35017, * 4–5 (S.D.N.Y. Feb. 14, 1992) (observing that "[d]efendants are not required to plead all of their proof in their counterclaims," and concluding allegations that an insurer intentionally participated in a fraudulent limited partnership scheme by bonding the investments and prevailing upon banks to provide loans to the partnerships adequately alleged substantial assistance); *Harrison v. Enventure Capital Group, Inc.*, 666 F.Supp. 473, 477 (W.D.N.Y.1987) (". . . the acts or omissions that comprise the necessary substantial assistance must be pleaded with specificity. Generalized and conclusory allegations that a defendant aided and abetted the principal wrongdoers will not suffice").

Here, the complaint adequately alleges what Leider did to assist Slatkin in defrauding the investors. The complaint pleads numerous specific statements by Leider to Club investors, and states why they were false. Fairly read, it pleads that Leider had a practice of making such statements to class members, commencing in 1992, when she began working at Pacific Inland Bank, and continuing until 1999, when the accounts were acquired by Union Bank.[86] See *Bonilla v. Trebol Motors Corp.*, Civil No. 92–1795(JP), 1997 WL 178844, * 51 (D.P.R. Mar.27, 1997) ("'If the fraud involved either a course of conduct occurring over an extended period of time or a series of transactions, it is not necessary to recite in detail the facts of each transaction of the fraudulent scheme,'" quoting *Federal Savings &*

---

82. See Third Amended Complaint, ¶¶ 51, Ex. 4.

83. *Id.*, ¶¶ 53, 54, 71.

84. *Id.*, ¶¶ 65, 74.

85. The complaint alleges specific representations by Leider to five account holder plaintiffs: George Kriste, Fred Ockrim, Stuart Stedman, the trustee of the Dewey Trust and Jaroslav Marik.

86. See Third Amended Complaint, ¶¶ 47, 50.

*Loan Ins. Corp. v. Shearson–American Express, Inc.,* 658 F.Supp. 1331, 1337 (D.P.R.1987)). rev'd. in part, vacated in part on other grounds, 150 F.3d 88 (1st Cir.1998). While the complaint does not allege that Leider made the statements to each and every member of the putative class, or indeed to each named plaintiff, the inference to be drawn from the allegations is that her representations to various members of the class harmed all plaintiffs because the statements allowed Slatkin to retain possession of plaintiffs' funds and continue the Ponzi scheme.

■■ Rule 9(b) is designed to ensure that defendants have notice of the specific conduct with which they are charged, and to guard against the filing of unsubstantiated charges that may harm an individual's reputation. See *Bly–Magee v. State of California,* 236 F.3d 1014, 1018 (9th Cir. 2001) ("Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis,'" quoting *In re Stac Electronics Securities Litigation,* 89 F.3d 1399, 1405 (9th Cir.1996)). Thus, "[t]o comply with Rule 9(b), allegations of fraud [or substantial assistance] must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Id.* at 1019 (quoting *Neubronner v. Milken,* 6 F.3d 666, 672 (9th Cir.1993)). Here, the complaint clearly identifies the misconduct with which Leider is charged, and provides sufficient information to enable her to prepare an adequate defense. More is not required.

Leider asserts that the allegations are insufficient because plaintiffs do not plead how these various activities substantially assisted Slatkin. Yet the complaint alleges that Leider was "a key factor in the growth of the Club and Mr. Slatkin's Ponzi scheme in general," and that she "served as an important buffer between Mr. Slatkin and the Club members" by "cover[ing] for [his] delays" in payment and "calming potentially irate investors." [87] It further alleges that Leider's representation that the Banks audited the investor accounts "created a sense of security" in the investors.[88] Coupled with the specific facts alleged, these allegations adequately plead that Leider's actions were a "substantial factor" in Slatkin's ability to perpetrate the fraudulent scheme. Accordingly, the court finds that plaintiffs have adequately alleged that Leider substantially assisted Slatkin's fraud and breach of fiduciary duty.

### 4. Whether Plaintiffs Must Allege That Leider Owed Them An Independent Duty

Leider asserts finally that the aiding and abetting claims fail as a matter of law because she did not owe plaintiffs an independent fiduciary duty.[89] Leider acknowledges that no California court has held that a defendant cannot be liable as an aider and abettor unless he or she had an independent duty to the plaintiff. She contends, however, that California courts have implicitly adopted such a rule, and that federal courts have expressly approved it.

87. *Id.,* ¶¶ 50, 53.

88. *Id.,* ¶ 55.

89. See *infra* at 1134–35.

### a. California Law

Leider first argues that an independent duty requirement is implicit in California law because California courts have analogized aiding and abetting to conspiracy, and California law requires that each conspirator owe the duty violated by the underlying tort before he or she can be held liable.

California courts have certainly recognized that conspiracy and aiding and abetting are closely allied forms of liability. See *Janken v. GM Hughes Electronics,* 46 Cal.App.4th 55, 78, 53 Cal.Rptr.2d 741 (1996) ("Conspiracy is a concept closely allied with aiding and abetting. A conspiracy generally requires agreement plus an overt act causing damage. Aiding and abetting requires not agreement, but simply assistance. The common basis for liability for both conspiracy and aiding and abetting, however, is concerted wrongful action"); *Howard, supra,* 2 Cal.App.4th at 749, 3 Cal.Rptr.2d 575 ("In the abstract, there may be a distinction between an aiding and abetting cause of action and one for civil conspiracy. However, while aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act. A plaintiff's object in asserting such a theory is to hold those who aid and abet in the wrongful act responsible as joint tortfeasors for all damages ensuing from the wrong").

California courts have also held that a claim for civil conspiracy does not arise unless the alleged conspirator owed the victim a duty not to commit the underlying tort. See *Applied Equipment Corp. v. Litton Saudi Arabia Limited,* 7 Cal.4th 503, 514, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994) ("Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law"); *Doctors' Company, supra,* 49 Cal.3d at 44, 260 Cal. Rptr. 183, 775 P.2d 508 ("A cause of action for civil conspiracy may not arise, however, if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty").

▉ No California case, however, holds that a party must owe the plaintiff a duty before he or she can be held liable as an aider and abettor. Rather, California cases outlining the elements of aiding and abetting liability have consistently cited the elements of the tort as they are set forth in the Restatement (Second) of Torts, § 876, and have omitted any reference to an independent duty on the part of the aider and abettor. Under this formulation, liability may properly be imposed on one who knows that another's conduct constitutes a breach of duty and substantially assists or encourages the breach. See *Fiol, supra,* 50 Cal.App.4th at 1325–26, 58 Cal.Rptr.2d 308; *Saunders, supra,* 27 Cal.App.4th at 846, 33 Cal.Rptr.2d 438; REST. 2D TORTS, § 876.[90] See also *In Re First Alliance Mortgage Co.,* 298 B.R. 652,

---

**90.** Leider argued at the hearing that the court cannot rely on *Fiol* for the rule that aiding and abetting liability requires no independent duty because the question was not squarely presented in *Fiol,* and thus was not addressed by the court. The court cannot agree. The *Fiol* court articulated alternative tests for aiding and abetting liability and evaluated whether the defendant supervisor could be held liable for aiding and abetting the sexually harassing conduct of plaintiff's co-worker under both. Under the actual knowledge and substantial assistance test, the court concluded that the supervisor's failure to take action

668 (C.D.Cal.2003) (citing *Saunders*); *Wynn v. National Broadcasting Co., Inc.*, 234 F.Supp.2d 1067, 1114 (C.D.Cal.2002) ("Since neither [the FEHA nor New York's Human Rights Law] provides a definition of aiding and abetting, courts have looked to the common law definition. '[O]ne is subject to liability if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.' Restatement (Second) of Torts § 876 (1979)," citing *Fiol, supra*, 50 Cal.App.4th at 1325–26, 58 Cal. Rptr.2d 308); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1183 (C.D.Cal.2002) ("California has adopted the joint liability principle laid out in the Restatement (Second) of Torts § 876").

Leider argues nonetheless that such a result is the natural extension of the principles enunciated by the California Supreme Court in *Applied Equipment*. After analyzing that decision carefully, the court concludes to the contrary. In *Applied Equipment*, the Court noted that conspiracy was "not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.... By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." *Applied Equipment, supra*, 7 Cal.4th at 511, 28 Cal.

Rptr.2d 475, 869 P.2d 454. The Court further observed that "'... the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.'" *Id.* (quoting *Doctors' Co., supra*, 49 Cal.3d at 44, 260 Cal. Rptr. 183, 775 P.2d 508). For this reason, the Court held, the "... tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Id.*

 Unlike a conspirator, an aider and abettor does not "adopt as his or her own" the tort of the primary violator. Rather, the act of aiding and abetting is distinct from the primary violation; liability attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort. See *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C.Cir.1983) ("Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct.... There is a qualitative difference between proving an *agreement* to participate in a tortious line of conduct, and proving *knowing action* that substantially aids tortious conduct"); [91]

---

to prevent the harassment did not constitute substantial assistance. *Fiol, supra*, 50 Cal. App.4th at 1326, 58 Cal.Rptr.2d 308. Under the substantial assistance and breach of duty formulation, the court held that "a supervisory employee owes no duty to his or her subordinates to prevent sexual harassment in the workplace." *Id.* Even if *Fiol* had not applied the first test for aiding and abetting liability, however, the court would find it appropriate to rely on the case. The court does not cite

*Fiol* for its holding that there was no liability for aiding and abetting under the facts there presented. Rather, it relies on *Fiol*'s statement of the elements of an aiding and abetting claim, a formulation that is generally applicable, is also set forth in *Saunders*, and is drawn directly from the Restatement.

**91.** *Halberstam* was cited favorably in *Howard, supra*, 2 Cal.App.4th at 749, 3 Cal.Rptr.2d 575.

*Wenneman v. Brown,* 49 F.Supp.2d 1283, 1290, n. 3 (D.Utah 1999) ("This Court recognizes fundamental and significant differences between aiding and abetting, by which a person gives aid to a criminal wrongdoer, and conspiracy, by which a person knowingly joins others in a criminal undertaking with a common criminal goal"). See also *Aetna Casualty & Surety Co., supra,* 219 F.3d at 534 (quoting *Halberstam* and stating that "[t]he District of Columbia Circuit has succinctly identified the ... difference between the torts of conspiracy to commit fraud and aiding and abetting fraud"); *id.* at 538 (quoting *Halberstam*'s statement that there is a "qualitative difference" between "agreement to participate in a tortious line of conduct, and proving knowing action that substantially aids tortious conduct"); *In re Washington Public Power Supply System Securities Litigation,* MDL No. 155, 1988 WL 158948, * 15 (W.D.Wash. July 14, 1988) ("The court in *Halberstam* ... provides some guidance with its careful analysis of two theories of secondary tort liability. The *Halberstam* court distinguished conspiracy from aiding and abetting by observing that a conspiracy consists of concerted action by agreement while aiding and abetting is concerted action by substantial assistance"). Because aiders and abettors do not agree to commit, and are not held liable as joint tortfeasors for committing, the underlying tort, it is not necessary that they owe plaintiff the same duty as the primary violator. Conspirators, by contrast, are held liable for the tort committed by their co-conspirator. See *Applied Equipment, supra,* 7 Cal.4th at 510–11, 28 Cal.Rptr.2d 475, 869 P.2d 454. Because liability is premised on the commission of a single tort, it is logical that all conspirators must be legally capable of committing the wrong.

▮▮▮▮ Additionally, causation is an essential element of an aiding and abetting claim, i.e., plaintiff must show that the aider and abettor provided assistance that was a substantial factor in causing the harm suffered. See *Metge v. Baehler,* 762 F.2d 621, 624 (8th Cir.1985) (a plaintiff seeking to prevail on an aiding and abetting claim must prove a " 'substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff[,]' ... or a showing that 'the encouragement or assistance is a substantial factor in causing the resulting tort' "), cert. denied, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986); *Cromer Finance Ltd., supra,* 137 F.Supp.2d at 470 ("Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated"). A plaintiff seeking to prove a conspiracy claim, by contrast, need not adduce proof that the purported conspirator did *anything* that caused or contributed to the harm. All that is needed is proof of an agreement to commit the tort. See *Applied Equipment, supra,* 7 Cal.4th at 511, 28 Cal.Rptr.2d 475, 869 P.2d 454 (noting that alleged conspirators can be held liable as " '... joint tortfeasor[s] for all damages ensuing from the wrong, irrespective of whether or not [they were] direct actor[s] and regardless of the degree of [their] activity,' " quoting *Doctors' Co., supra,* 49 Cal.3d at 44, 260 Cal.Rptr. 183, 775 P.2d 508). This difference too demonstrates the distinction between the forms of liability, and argues in favor of a rule that permits the imposition of aider and abettor liability in the absence of a duty owed directly to the plaintiff.

▮▮▮ In sum, the court concludes that the analysis set forth in *Applied Equipment* does not mandate a finding that California law implicitly requires that a defendant owe plaintiffs a duty before she can be held liable for aiding and abetting. In the absence of an express holding by the

California Supreme Court (or some other California court) to this effect, the court declines to apply such a rule in this case.

### b. Federal Law

Leider next argues that federal courts interpreting California law have required that plaintiffs prove that defendant owed them an independent duty as a prerequisite to the imposition of aider and abettor liability. Leider relies primarily on *Grosvenor Properties Ltd. v. Southmark Corp.*, 896 F.2d 1149 (9th Cir.1990). In *Grosvenor*, plaintiff alleged that defendant had conspired with his employer, and aided and abetted the employer's wrongful misappropriation of the benefits of a joint venture agreement. *Id.* at 1153. The Ninth Circuit held that the defendant owed plaintiff no independent duty and consequently that he could not be liable for "any tort in connection with his actions in regard to [plaintiff]." *Id.* at 1154. Citing this language, Leider contends the Ninth Circuit held that under California law, an aider and abettor must owe plaintiff an independent duty. The court disagrees. As described in *Grosvenor*, the district court granted the defendant's motion for directed verdict "on the ground that an officer of a defendant corporation acting within the scope of his authority cannot be held liable for conspiring with the corporation to commit a breach of fiduciary duty of the corporation." *Id.* at 1151. This is

the ruling that was appealed to the Ninth Circuit. *Id.* at 1153.

It is true that later in the opinion the circuit court stated that plaintiff alleged the corporate officer "conspired with [his corporate employer] and aided and abetted its wrongful misappropriation of the fruits of a joint venture." *Id.* The court's discussion of the claim, however, is based entirely on California conspiracy law, and does not cite any California cases addressing liability for aiding and abetting. See *id.* at 1153–54 (citing *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973)). It was based on conspiracy law alone that the court determined that the defendant could not be liable for "any tort" because he owed no independent duty to the plaintiff corporation. *Id.* at 1154. The court's reliance on conspiracy law is consistent with its description of the ruling appealed, and supports the conclusion that the case does not articulate a rule applicable to liability for aiding and abetting as opposed to conspiracy.[92] *Grosvenor*, therefore, does not control this court's interpretation of aiding and abetting liability under California law.[93]

Leider also cites *In re County of Orange*, 203 B.R. 983 (Bkrtcy.C.D.Cal. 1996), aff'd. in part, rev'd. in part on other grounds, *In re County of Orange*, 245 B.R. 138 (C.D.Cal.1997), for its holding that aiding and abetting liability in California may

**92.** The court's single reference to aiding and abetting in a case that otherwise concerns conspiracy liability is perhaps illustrative of the fact that "[c]ourts and commentators have frequently blurred the distinction between the two theories of concerted liability." *Halberstam, supra,* 705 F.2d at 478.

**93.** Moreover, even if the court were to read *Grosvenor* as broadly as Leider contends, *Grosvenor* was decided in 1990. This was long before the California Courts of Appeal decided *Fiol* and *Saunders*. To the extent

*Grosvenor* is inconsistent with these courts' interpretation of state law, the court concludes that it must follow the decisions of the California courts. See *Pershing Park Villas Homeowners Ass'n. v. United Pacific Ins. Co.*, 219 F.3d 895, 903 (9th Cir.2000) ("We are only ... bound [to follow Ninth Circuit interpretations of state law], however, 'in the absence of any subsequent indication from the [state] courts that [the previous] interpretation was incorrect,' " quoting *Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir.1983)).

only be imposed on those who owe an independent duty to the plaintiff. *Id.* at 997 ("S & P argues that recent California case law requires that the County's claim for aiding and abetting breach of a fiduciary duty be dismissed, because S & P does not have an independent fiduciary duty to the County.... After reviewing the history of California case law in this area, I am convinced that S & P is correct. A proper interpretation of *Applied Equipment* requires that in order for the County to bring an aiding and abetting breach of a fiduciary duty suit against S & P, S & P must have owed the County an independent fiduciary duty."). In *County of Orange*, the court grappled with precisely the same issue this court addressed above—i.e., whether under California law, the rule of *Doctors' Co.* and *Applied Equipment* is as applicable to aiding and abetting claims as it is to conspiracy. Noting that California courts have held that aiding and abetting and conspiracy are "closely allied," and that both involve "concerted action," the *County of Orange* court concluded that the same rule should apply. *Id.* at 999. For the reasons stated above, the court reaches a contrary conclusion, and declines to follow the reasoning set forth in *County of Orange.*

In sum, the court finds that under California law, a defendant may be found liable for aiding and abetting a breach of fiduciary duty even though the defendant owes no independent duty to the plaintiff, so long as the aider and abettor knows of, and substantially assists, the primary violator's breach of duty. Since this is the nature of the aiding and abetting claim plaintiffs have asserted against Leider, the claim is adequately pled despite plaintiffs' failure to allege that Leider owed them an independent fiduciary duty.

**E. Whether The Complaint Adequately Pleads Breach Of Fiduciary Duty**

■ Plaintiffs' third cause of action alleges that defendants, "as custodians and/or trustees of the Club's accounts," breached their fiduciary duties to Club members.[94] To state a claim for breach of fiduciary duty, a complaint must allege the existence of a fiduciary duty, its breach, and damages resulting therefrom. *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 483, 80 Cal.Rptr.2d 329 (1998) ("The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach"); *Pierce v. Lyman,* 1 Cal.App.4th 1093, 3 Cal.Rptr.2d 236 (1991) ("In order to plead a cause of action for breach of fiduciary duty, there must be shown the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. The absence of any one of these elements is fatal to the cause of action"). Although this claim is brought against all defendants, only Bank of Orange County and Leider challenge its validity. The court evaluates each challenge in turn.

**1. The Bank of Orange County**

The complaint alleges that the each of the Banks had a fiduciary duty "not to commingle assets; the duty to maintain accurate accounting records; the duty to refrain from accepting illegal investment directions; the duty to audit the assets of the Club; the duty to verify the assets of the Club; the duty to review the adequacy of internal controls; ... the duty to perform accurate valuations of the Club; ... the duty to supply each Club member with an accurate account statement ... [and] a fiduciary duty to provide market values of

---

94. Third Amended Complaint, ¶ 131.

the Club members' accounts after audited financial statements of the Club had been completed." [95] The complaint further alleges that the Banks failed to perform and breached these duties,[96] causing plaintiffs damage.[97] Three of the named plaintiffs maintained accounts at Bank of Orange County's predecessor-in-interest, Pacific Inland Bank—Jaroslov Marik, Fred Ockrim, and Sheri Ockrim. The Bank contends these plaintiffs' breach of fiduciary duty claims fail because Pacific Inland Bank did not owe them a fiduciary duty, and because, even if it did, the custodial agreements plaintiffs executed demonstrate that it owed none of the duties alleged by plaintiffs in the complaint.

 California courts have generally held that banks are not fiduciaries for their depositors. *Copesky v. Superior Court*, 229 Cal.App.3d 678, 693, 280 Cal. Rptr. 338 (1991). They have also held, however, that a fiduciary relationship may arise between a bank and its depositors where funds are deposited in a custodial account. *Van de Kamp v. Bank of America*, 204 Cal.App.3d 819, 859–60, 251 Cal. Rptr. 530 (1988) ("It may safely be said the deposit of securities into a custodial agency account creates a trust relationship"). See also *LaMonte v. Sanwa Bank California*, 45 Cal.App.4th 509, 517, 52 Cal. Rptr.2d 861 (1996) (same, quoting *Van de Kamp*). Bank of Orange County does not dispute that the three plaintiffs' funds were deposited into custodial accounts. Indeed, the court previously found that plaintiffs had adequately alleged the Club accounts were custodial in nature, and plaintiffs attach numerous documents to the complaint confirming this fact. Accordingly, Bank of Orange County's first argument—that Pacific Inland was not a fiduciary—fails.

As respects the bank's second argument—that Pacific Inland owed none of the fiduciary duties alleged in the complaint—California courts hold that a fiduciary's duties may be limited by contract. See *Van de Kamp, supra,* 204 Cal.App.3d at 860, 251 Cal.Rptr. 530 (a bank's duties as an agent under a custodial account are "limited to the scope of the agency set forth in the parties' agreement" and it "is a fiduciary [only] with respect to matters within the scope of the agency"). See also *LaMonte, supra,* 45 Cal.App.4th 509, 517, 52 Cal.Rptr.2d 861 (1996) (same); *Brown v. California Pension Administrators,* 45 Cal.App.4th 333, 337–38, 52 Cal.Rptr.2d 788 (1996) ("express provisions in documents governing the business relationship between the parties limited the duties of the trustee and the administrator. As a result, neither the trustee nor the administrator had an obligation to provide appellants with information about the performance of investments other than their own").

Bank of Orange County cites one document attached to the complaint that it contends undermines the fiduciary duty allegations of the Ockrims and Marik. The document, titled "Trustee Responsibilities With Respect to Assets Subject to Investment By Other Persons," was signed by plaintiff Jaroslov Marik on August 23, 1991. In relevant part, it states:

"The trustee shall not be under any obligation or duty ... to review any securities or other property of the Trust constituting assets thereof with respect to which another person possesses investment management responsibility." [98]

The bank argues that this document clearly limits the duties Pacific Inland owed the three plaintiffs. Specifically, it asserts,

---

**95.** *Id.,* ¶ 132.

**96.** *Id.,* ¶ 133.

**97.** *Id.*

**98.** Third Amended Complaint, Exh. 34.

the agreement makes clear that Pacific Inland did not undertake to "audit the assets of the Club," "verify the assets of the Club" or perform any of the other tasks alleged in paragraph 132. For this reason, Bank of Orange County contends, it and its predecessor-in-interest, Pacific Inland, were merely non-discretionary custodians with no fiduciary duties to plaintiffs.

The contract proffered by Bank of Orange County is signed only by Marik, and the bank has not produced a similar agreement signed by the Ockrims. It is not clear on the present record, therefore, whether the duties the bank undertook with respect to the Ockrims' account were similarly limited. Moreover, although the contract limits the fiduciary duties of Pacific Inland Bank in certain respects, it contains no language limiting Pacific Inland's duty to issue accurate account statements. Additionally, it is unclear whether the contract's reference to "reviewing" the securities or other property held in a custodial account is intended to limit the bank's responsibility for auditing and/or accurately valuing accounts, or simply to limit its obligation to oversee the investment decisions being made by the investment manager. Given the myriad fact questions that exist on the present record, the court finds that plaintiffs have adequately alleged a cause of action against Bank of Orange Count for breach of fiduciary duty and denies the bank's motion to dismiss the claim.

## 2. Leider

Leider also argues that the breach of fiduciary duty claim against her must be dismissed. After alleging the nature of the fiduciary duties purportedly owed by the Banks, the complaint asserts that "[a]s the officer in charge of administering the Club, Ms. Leider owed each Club member the same duties."[99] Leider argues that, as a matter of law, she owed plaintiffs no fiduciary duty independent of that owed by the Banks.

 It is well-established in California that " 'a corporation's employees owe no independent fiduciary duty to a third party with whom they deal on behalf of their employer.' " *Slottow v. American Cas. Co. of Reading, Pennsylvania,* 10 F.3d 1355, 1359 (9th Cir.1993) (quoting *Grosvenor Properties Ltd. v. Southmark Corp.,* 896 F.2d 1149, 1154 (9th Cir.1990) (citing *United States Liab. Ins. Co. v. Haidinger–Hayes, Inc.,* 1 Cal.3d 586, 594–95, 83 Cal. Rptr. 418, 463 P.2d 770 (1970), and *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 785, 157 Cal.Rptr. 392, 598 P.2d 45 (1979))).

Plaintiffs do not dispute that corporate officers in California generally have no fiduciary duty to third parties for acts performed on behalf of the corporation. Although they argue that there is an exception to this rule in the trust context, plaintiffs cite no authority supporting the proposition.[100] Moreover, plaintiffs overlook the fact that *Slottow* involved a trust.

---

**99.** *Id.,* ¶ 131.

**100.** Plaintiffs cite several cases holding that officers of a corporate trustee have a fiduciary duty to trust beneficiaries and are liable to the beneficiaries when they know or should have known of a conversion of the trust property to the use of the corporation. See *Middlesex Ins. Co. v. Mann,* 124 Cal.App.3d 558, 572, 177 Cal.Rptr. 495 (1981) ("[A] corporate officer has a fiduciary duty to the beneficiary of a trust and is liable to the beneficiary for wrongful conversion of the trust property to

the use of the corporation of which he knew or in the exercise of his fiduciary duties should have known," citing *Knoblock v. Waale–Camplan Co.,* 141 Cal.App.2d 870, 874, 297 P.2d 765 (1956) ("Both being agents of the corporate trustee, when they thus relieved the corporation of its possession of the trust money, they, individually, were charged with the same duties and obligations as had been imposed upon the corporate trustee")). Plaintiffs do not allege that their investment monies were wrongfully used for bank purposes.

In *Slottow,* a bank subsidiary served as trustee for loan pool investors. Slottow, who signed and supervised the trust agreements, was the subsidiary's president and also an officer and director of the parent bank. The investors sued the bank, the subsidiary and Slottow, alleging that the loan pool had been a Ponzi scheme and that defendants were liable for breach of contract, negligence and breach of fiduciary duty. The trial court dismissed the contract claim against Slottow, and the parties later settled. In evaluating whether the settlement agreement adequately apportioned liability to Slottow on the negligence and breach of fiduciary duty claims, the Ninth Circuit concluded that Slottow faced no liability for breach of fiduciary duty, citing the rule announced in *Grosvenor.*[101]

Here, plaintiffs seek to hold Leider liable for acts performed on behalf of her employer. Because, under California law, Leider owed plaintiffs no duty with respect to such conduct, the breach of fiduciary duty claim against Leider must be dismissed with leave to amend.

## F. Whether The Complaint Adequately Pleads Fraud And Negligent Misrepresentation

Plaintiffs' fourth and fifth causes of action, asserted against all defendants, are for fraud and negligent misrepresentation. Their adequacy is challenged by defendants Bank of Orange County and Leider. To state a cause of action for fraud, a plaintiff must allege "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of

---

Rather, they assert that Slatkin stole the money from them, and that the Banks' purported breaches of fiduciary duty assisted him in this regard. Accordingly, plaintiffs' reliance on *Middlesex* and *Knoblock* is misplaced.

Plaintiffs also cite cases holding that officers may be personally liable for the torts of the corporation if they are personally involved in those torts. *Haidinger–Hayes, supra,* 1 Cal.3d at 594–95, 83 Cal.Rptr. 418, 463 P.2d 770 ("Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done. They may be liable, under the rules of tort and agency, for tortious acts committed on behalf of the corporation"); *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 785, 157 Cal.Rptr. 392, 598 P.2d 45 (1979) ("Directors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions, but may become liable if they directly ordered, authorized or participated in the tortious conduct"). These cases do not hold that officers owe third parties a "fiduciary duty" in connection with work they perform for their employers. Rather, consistent with the rule announced in *Slottow* and *Grosvenor,* they reaffirm that corporate officers cannot be held liable for breach of their

duty to the corporation, but only for torts for which they would be independently liable to third parties. See *Haidinger–Hayes, supra,* 1 Cal.3d at 595, 83 Cal.Rptr. 418, 463 P.2d 770 (corporate officers "are not responsible to third persons for negligence amounting merely to nonfeasance, to a breach of duty owing to the corporation alone; the act must also constitute a breach of duty owed to the third person.... Liability imposed upon agents for active participation in tortious acts of the principal have been mostly restricted to cases involving physical injury, not pecuniary harm, to third persons.... More must be shown than breach of the officer's duty to his corporation to impose personal liability to a third person upon him"). Here, Leider cannot be jointly liable with the Banks for breach of fiduciary duty because she did not independently owe such a duty to plaintiffs. Rather, she owed duties only to her employer.

**101.** Plaintiffs erroneously argue that "even the *Slottow* court would have held the employee in question personally liable had there been 'personal direction or participation in the tort ...' " The excerpt they cite, however, refers only to the negligence claim, not the claim for breach of fiduciary duty. Moreover, as noted earlier, Leider cannot have personally have participated in a breach of fiduciary duty because she owed no duty to plaintiffs.

falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Medical Group, Inc.,* 15 Cal.4th 951, 974, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997); *Lazar v. Superior Court,* 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996) (same); *Anderson v. Deloitte & Touche,* 56 Cal.App.4th 1468, 1474, 66 Cal.Rptr.2d 512 (1997) (same).

■ The elements of a cause of action for negligent misrepresentation are the same as those of a claim for fraud, with the exception that the defendant need not actually know the representation is false. Rather, to plead negligent misrepresentation, it is sufficient to allege that the defendant lacked reasonable grounds to believe the representation was true. *B.L.M. v. Sabo & Deitsch,* 55 Cal.App.4th 823, 834, 64 Cal.Rptr.2d 335 (1997) (" 'Negligent misrepresentation is a form of deceit, the elements of which consist of (1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages,' " citing *Fox v. Pollack,* 181 Cal.App.3d 954, 962, 226 Cal.Rptr. 532 (1986)). See also *Glenn K. Jackson Inc. v. Roe,* 273 F.3d 1192, 1201, n. 2 (9th Cir. 2001) ("The elements of negligent misrepresentation include: (1) misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the misrepresentation, (4) ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed, and (5) resulting damage"); *Firoozye v. Earthlink Network,* 153 F.Supp.2d 1115, 1128 (N.D.Cal.2001) ("The elements for a claim for negligent misrepresentation are similar [to the elements for fraud]; the plaintiff must show

that the defendant made a misrepresentation without reasonable grounds for believing it to be true and that the representation was intended to induce the plaintiff to take some action in reliance upon it," citing *B.L.M., supra* ).

Both Bank of Orange County and Leider argue that the fraud and negligent misrepresentation claims fail to satisfy the heightened pleading standard set forth in Rule 9(b). It is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirements. *Glen Holly Entertainment, Inc. v. Tektronix, Inc.,* 100 F.Supp.2d 1086, 1093 (C.D.Cal.1999) ("Claims for fraud and negligent misrepresentation must meet the heightened pleading requirements of Rule 9(b)"); *U.S. Concord, Inc. v. Harris Graphics Corp.,* 757 F.Supp. 1053, 1058 (N.D.Cal.1991) ("Defendant further asserts that the negligent misrepresentation claim fails to satisfy Rule 9(b)'s particularity requirements. The point is well-taken. Since the claim is based upon the same flawed allegations of misrepresentation as the fraud count, it, too, fails for lack of specificity").

Rule 9(b) requires that the facts constituting the fraud or mistake be pled with specificity. Conclusory allegations are insufficient. FED.R.CIV.PROC. 9(b); *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir.1989) ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer to the allegations. While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient"); *Walling v. Beverly Enters.,* 476 F.2d 393, 397 (9th Cir.1973) (concluding that allegations stating the time, place, and nature of allegedly fraudulent activities

meet Rule 9(b)'s particularity requirement).

■ Bank of Orange County and Leider contend that the fraud allegations against them must be dismissed because the third amended complaint fails to allege that either Leider or another Pacific Inland employee made knowingly false representations to any of the named plaintiffs, or that Leider or any other employee was authorized to do so by Pacific Inland. The court agrees. While plaintiffs cite numerous allegations that recite purportedly false statements by Leider,[102] none specifically alleges that Leider knew the representation described was false.

■ Bank of Orange County and Leider similarly argue that the negligent misrepresentation claim against them fails to plead that Leider made the representations alleged lacking reasonable grounds to believe that they were true. Once again, no such allegation appears in the complaint. Accordingly, plaintiffs' claims for fraud and negligent misrepresentation against Bank of Orange County and Leider must be dismissed with leave to amend.

### G. Whether The Complaint Adequately Pleads Constructive Fraud

■ Plaintiffs' sixth cause of action alleging constructive fraud is asserted against all defendants, and challenged by defendants Bank of Orange County and Leider. To state a cause of action for constructive fraud, a plaintiff must allege (1) a fiduciary or confidential relationship; (2) an act, omission or concealment involving a breach of that duty; (3) reliance; and (4) resulting damage. *Assilzadeh v. California Federal Bank*, 82 Cal.App.4th 399, 414, 98 Cal.Rptr.2d 176 (2000) ("Constructive fraud is a unique species of fraud applicable only to a fiduciary or confiden-

tial relationship. As a general principle constructive fraud comprises any act, omission or concealment involving a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent. Most acts by an agent in breach of his fiduciary duties constitute constructive fraud" (citations omitted)). See also *In re Harmon*, 250 F.3d 1240, 1249, n. 10 (9th Cir.2001) (citing *Assilzadeh, supra*).

■ Bank of Orange County and Leider contend that plaintiffs' constructive fraud claim must be dismissed because neither Pacific Inland nor Leider owed plaintiffs a fiduciary duty. As discussed above, plaintiffs have adequately alleged that Pacific Inland owed them a fiduciary duty, and Bank of Orange County's motion to dismiss the constructive fraud count fails as a result. The court has found, by contrast, that the complaint does not sufficiently allege that Leider had a fiduciary duty to plaintiffs. Accordingly, her motion to dismiss this claim is granted with leave to amend.

### H. Whether The Complaint Adequately Pleads Negligence

Bank of Orange County challenges the sufficiency of plaintiffs' seventh cause of action for negligence, which is asserted against all defendants. To state a negligence claim, plaintiffs must allege, *inter alia*, that defendants owed them a duty. See, e.g., *Whitfield v. Heckler & Koch, Inc.*, 82 Cal.App.4th 1200, 1217, 98 Cal. Rptr.2d 820 (2000) ("Actionable negligence is traditionally regarded as involving the following: (a) a legal duty to use due care; (b) a breach of such legal duty; (c) the breach as the proximate or legal cause of the resulting injury" (citations omitted)).

---

**102.** See, e.g., Third Amended Complaint, ¶¶ 51–61, 67, 69–70, 72, 76, 104, 105 and 116.

Whether one owes another a duty is a question of law. See *Dutton v. City of Pacifica,* 35 Cal.App.4th 1171, 1175, 41 Cal.Rptr.2d 816 (1995).

■ Bank of Orange County argues that the complaint fails to state a claim for negligence for "the same factual and legal grounds as the negligent misrepresentation count." The court fails to understand this argument. There is no requirement that negligence be pleaded with heightened specificity pursuant to Rule 9(b). Furthermore, the complaint has adequately alleged a negligence claim. It pleads that the Banks had a "duty of reasonable care to their clients to ensure the accuracy, legitimacy, and existence of the assets of the Club." [103] It further alleges that the Banks breached this duty by failing to ensure accuracy, by commingling the assets of Club accounts, and by allowing Slatkin to accept the Club members' funds even though the Banks knew he was not a registered investment advisor.[104] The complaint alleges that Club members suffered damages as a result, and that the damages were proximately caused by the Banks' conduct.[105] Thus, the negligence claim against Bank of Orange County survives under Rule 12(b)(6).

## I. Whether The Complaint States a Claim For Violation Of California Business And Professions Code § 17200

Plaintiffs' final claim for relief is brought on behalf of the general public, and alleges that the Banks engaged in unfair business practices in violation of California Business & Professions Code §§ 17200 et seq. This claim is brought against all defendants, but once again, is challenged only by Bank of Orange County. To state a cause of action for violation of § 17200, a plaintiff must allege an "unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200. See also *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999) ("... as relevant here, [§ 17200] defines "unfair competition to include any unlawful, unfair or fraudulent business act or practice...." Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law.... By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.... However, the law does more than just borrow. The statutory language referring to any unlawful, unfair or fraudulent practice ... makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. In other words, a practice is prohibited as unfair or deceptive even if not unlawful and vice versa" (internal quotations omitted)).

■ Bank of Orange County argues that plaintiffs' § 17200 claim must be dismissed because the complaint fails to plead an "unlawful, unfair or fraudulent business act or practice" by Pacific Inland. Count eight clearly incorporates the earlier factual allegations supporting counts one through seven, however, and alleges that "[t]he Banks' actions constitute unfair, illegal, and fraudulent business practices within the meaning of Cal. Bus. & Prof. Code sections 17200 et seq." [106] Accord-

103. First Amended Complaint, ¶ 161.

104. *Id.*

105. *Id.*

106. *Id.,* ¶ 163.

ingly, the court finds that the complaint alleges unlawful, unfair or fraudulent business acts or practices sufficient to survive dismissal under Rule 12(b)(6).

### J. Whether The Complaint Adequately Pleads Fraudulent Transfer

The ninth cause of action is brought by Neilson pursuant to California's Uniform Fraudulent Transfer Act ("CUFTA"), California Civil Code § 3439. The claim seeks to avoid and recover intentional fraudulent transfers allegedly made by Slatkin within the seven years preceding his filing of a bankruptcy petition on May 1, 2001. While the claim is asserted against Union Bank, Comerica and Imperial Management, only Imperial contests its sufficiency. Imperial argues that the claim must be dismissed because Neilson has not and cannot plead facts demonstrating that the claim is timely under the applicable four-year statute of limitations.

### 1. Legal Standards Governing Avoidance Of Fraudulent Transfers Under The California Uniform Fraudulent Transfer Act And 11 U.S.C. § 544(b)

A bankruptcy trustee's authority to bring a fraudulent transfer claim under the CUFTA derives from section 544(b) of the Bankruptcy Code. *In re Commercial Acceptance Corp.*, 5 F.3d 535, 1993 WL 327833, * 3, n. 3 (9th Cir. Aug.27, 1993) (Unpub.Disp.) ("Section 544(b), 11 U.S.C. provides that a trustee 'may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim.' There is no dispute that California's Uniform Fraudulent Transfer Act, Cal.Civ.Code § 3439, applies in this instance"); *Imperial Corp. of America v. Shields*, No. 92–1003–IEG (LSP), 1997 WL 808628, * 3 (S.D.Cal. Aug.20, 1997) ("Re-

garding applicable state law for purposes of Durkin's § 544 claim, California and Delaware have both enacted the Uniform Fraudulent Transfers Act"); *Durkin v. Shields*, No. 92–1003–IEG (LSP), 1997 WL 808651, * 11 (S.D.Cal. June 5, 1997) ("A trustee may assert state-law theories of fraudulent transfer under 11 U.S.C. § 544(b), which permits a trustee to 'avoid any transfer of an interest of the debtor in property that is voidable under applicable law by an unsecured creditor with an allowable claim,'" quoting 11 U.S.C. § 544(b)).

Section 544(b) provides, in relevant part,

> "The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1).

Federal courts generally limit recovery under § 544(b)(1) to those claims that a creditor of the estate could avoid as fraudulent under applicable state law. See, e.g., *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3rd Cir.2000) ("Section 544(b) is the operative avoidance power at issue here. Specifically, this provision authorizes the avoidance of 'any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowable] unsecured claim.' ... The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action"); *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996) ("If Mr. Sender is bringing claims

belonging to HSA L.P. itself, we fail to see how he can satisfy § 544(b)'s requirements that he establish the existence of an actual unsecured creditor who could avoid the challenged transactions under the applicable law"); *Official Committee of Asbestos Claimants of G–I Holding, Inc. v. Heyman*, 277 B.R. 20, 35 (S.D.N.Y.2002) ("To prevail on any of its avoidance claims under § 544(b) the Committee must demonstrate that an actual unsecured creditor exists who could avoid the Transactions under New York law").

### 2. Whether The Complaint Adequately Alleges Avoidance Of Fraudulent Transfers Under 11 U.S.C. § 544(b)

Neilson alleges that he is bringing the fraudulent transfer claim on behalf of the named plaintiffs as well as other unnamed unsecured creditors of Slatkin. As the complaint states, "[a]t all relevant times, the transfers of money from Mr. Slatkin to the Banks were voidable under Cal.Civ. Code §§ 3439.04(a) and 3439.07 by one or more of Mr. Slatkin's creditors. These creditors include, but are not limited to, the plaintiffs." [107] Imperial argues that this allegation is insufficient because, to the extent Neilson purports to act on behalf of the named plaintiffs, the claim is barred by the relevant statute of limitations. It asserts additionally that, to the extent the claim is brought on behalf of unsecured creditors not named in the complaint, it fails because the creditors are not identified. The court evaluates each proposition in turn.

### a. Unsecured Claims Of Named Plaintiffs

Imperial argues first that, to the extent Neilson's fraudulent transfer claim is brought on behalf of plaintiffs named in the complaint, it fails because their claims are barred by the relevant statute of limitations. A claim for intentional fraudulent transfer under the CUFTA must be brought within four years after the transfer was made or, if later, one year after the transfer was or reasonably could have been discovered by the claimant. In no event may an action be commenced later than seven years after the date of the transfer. The seven-year reach back period is an exception to the four-year statute of limitations, and applies only where the claimant alleges that he did not discover, and could not reasonably have discovered, the transfer within the four-year period. CAL. CIV. CODE §§ 3439.09(a), (c); *Cortez v. Vogt*, 52 Cal.App.4th 917, 919, 60 Cal. Rptr.2d 841 (1997) ("Section 3439.09, subdivisions (a) and (b) provide in part that an action by a creditor against a debtor for relief against a transfer or obligation under the UFTA is extinguished unless the action is brought 'within four years after the transfer was made or the obligation was incurred.' Section 3439.09, subdivision (a) also provides for a longer statute of limitations of one year after the transfer was or reasonably could have been discovered if the transfer was made with the intent to hinder, delay or defraud any creditor. Section 3439.09, subdivision (c) provides that notwithstanding any other provision of law an action with respect to a fraudulent transfer is 'extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred' "); *Monastra v. Konica Business Machines, U.S.A., Inc.*, 43 Cal.App.4th 1628, 1645, 51 Cal. Rptr.2d 528 (1996) (same). See also *Bresson v. C.I.R.*, 213 F.3d 1173, 1175 (9th Cir.2000) ("[P]ursuant to California Civil Code § 3439.09(b), claims under Section 3439.04(b) of the CUFTA are ordinarily 'extinguished' if they have not been

---

107. *Id.*, ¶ 168.

brought within four years of the relevant fraudulent transfer").

 Imperial contends the claims of the named creditor plaintiffs are time-barred because the third amended complaint fails to allege that they did not know, and could not have discovered, that Slatkin was paying their account fees. As a review of the pleading reveals, however, it clearly alleges that the Banks told investors they were deducting trustee fees from the investors' individual accounts, and that the investors relied on these representations to their detriment.[108] The complaint further alleges that with the Banks' help, Slatkin concealed from his creditors, including plaintiffs, the fact that he had transferred money to the Banks within the seven-year period.[109] Finally, the complaint alleges that the Banks affirmatively misrepresented to Club members that they, and not Slatkin, had transferred money to the Banks for "trustee's fees." [110] These allegations sufficiently plead that the creditor plaintiffs did not know of the allegedly fraudulent transfers.

Imperial next argues that, even if the complaint adequately pleads that the named plaintiffs did not know of the transfers within the four-year period, evidence attached to the complaint demonstrates otherwise. Specifically, it points to statements the Banks sent to investors that reflect a monthly entry for "Cash, Receipt, Reimbursement of Trustee Fees." [111] Defendant contends these monthly entries show that plaintiffs knew the fees were being paid by Slatkin. While the entries raise a question of fact regarding plaintiffs' knowledge, the court cannot find that such evidence establishes, as a matter of law, that plaintiffs knew or should have known of the transfers at the time they occurred.

Additionally, the referenced exhibit reflects only that the Neva and Wesley West Foundation received statements containing such entries. No similar evidence suggesting that other plaintiffs received identical statements is presently in the record. For this additional reason, the court is unable to find, as a matter of law, that the named plaintiffs knew, or should have known, of the allegedly fraudulent transfers within four years after they were made. Accordingly, Imperial's motion to dismiss the claim on this basis and to the extent asserted on behalf of these creditors is denied.

### b. Unsecured Claims Of Unidentified Individuals

Imperial also argues that to the extent plaintiffs assert the claims of individuals not joined in this suit, Neilson's fraudulent transfer claim fails because the complaint does not identify the creditors for whom he purports to act. Plaintiffs do not dispute that the complaint does not name these individuals. They argue, however, that this is not required at the pleadings stage.

 Federal courts applying fraudulent transfer law at the pleading stage generally require that the complaint allege the *existence* of an actual creditor holding an allowable unsecured claim who could avoid a transfer under applicable state law in the absence of a bankruptcy proceeding. *XL Sports, Ltd. v. Lawler,* 49 Fed. Appx. 13, 23, n. 9, 2002 WL 31260355, * 9, n. 9 (6th Cir. Oct.8, 2002) ("[Section] 544(b) seemingly requires the trustee (or debtor in possession) to at least allege the existence of an unsecured creditor who could avoid the transfer under state law," citing

---

108. *Id.,* ¶¶ 74, 97.

109. *Id.,* ¶ 169.

110. *Id.*

111. *Id.,* Exh. 7 at 142–146.

*In re Wintz Cos.*, 230 B.R. 848, 859 (8th Cir.BAP1999) ("[I]n order to avail himself of the benefits conferred by § 544(b), and concomitantly, of the MFTA, the Trustee 'must first show that there is an actual unsecured creditor holding an allowable unsecured claim ... who, under [state] law, could avoid the transfers in question.' ... Thus far, the Trustee has not only failed to identify such a creditor, but has failed even to allege that such a creditor exists, as he is required to do in order to meet this threshold burden. Accordingly, the Trustee presently lacks standing to pursue his fraudulent transfer actions")); *In re Meadowbrook Estates*, 246 B.R. 898, 903–04 (Bankr.E.D.Cal.2000) ("Nor does the complaint state a claim for relief under 11 U.S.C. § 544. It does not assert that any pre-petition transfer is avoidable under any of the powers granted to the debtor in possession by section 544(a). Nor does the complaint allege that a pre-petition transfer could be avoided by an actual unsecured creditor under applicable non-bankruptcy law as permitted by section 544(b)").

Courts are divided, however, as to whether a complaint must specifically allege the identity of the creditor to state a claim under § 544(b). Compare *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 673–74 (D.R.I.1998) ("The Complaint clearly satisfies the requirements of Rules 8 and 9(b). ... Plaintiff's failure to name an existing creditor is of no moment, for he is not required to prove his case at this point; his allegation that such a creditor exists suffices"); *In re Healthco International, Inc.*, 195 B.R. 971, 980 (Bankr.D.Mass. 1996) ("... the Trustee alleges he represents 'at least one qualified, unsecured creditor holding an allowable unsecured claim which existed at the time of the LBO....' Under the liberal rule of notice pleading, that allegation is enough. The Trustee need not name the creditor") with *In re Sverica Acquisition Corp., Inc.*, 179 B.R. 457, 464–65 (Bankr.E.D.Pa.1995) ("In support of Count VII the Trustee baldly asserts that '[a]t the time of the 1990 leveraged buy-out, an unsecured creditor of the Debtor existed.' ... Procedurally, this allegation is insufficient to satisfy even the minimal pleading requirements of Fed. R.Civ.P. 8 since it fails to adequately place Defendants on notice of whose rights the Trustee is claiming under. Such notice is imperative here because the Trustee's rights under Code § 544(b) are derivative of whatever rights the alleged creditor had under state law. It is crucial therefore that Defendants have proper notice of the identity of the alleged creditor in order that they might confirm or deny the validity of that entity's claim"); *In re Wingspread Corp.*, 178 B.R. 938, 945–46 (Bankr. S.D.N.Y.1995) ("The specific issue with which I must deal is whether the mere allegation of various unsecured creditors is sufficient to invoke section 544(b), or whether the Trustee must allege the existence of a specific unsecured creditor who would have standing to bring the action.... The Defendants contend that the Trustee must name an actual unsecured creditor who would have standing to challenge the transfer. I agree. '[B]efore a trustee is able to utilize applicable state or federal law referred to in Section 544(b), there must be an allegation and ultimately a proof of the existence of at least one unsecured creditor of the Debtor who at the time the transfer occurred could have, under applicable local law, attacked and set aside the transfer under consideration,'" quoting *Schaps v. Bally's Park Place, Inc.*, 58 B.R. 581 (E.D.Pa.1986), aff'd., 815 F.2d 693 (3d Cir.1987)); *In re Tri–Star Technologies Co., Inc.*, 260 B.R. 319, 329, n. 10 (Bankr.D.Mass.2001) ("This Court agrees with those cases which hold that the estate representative must identify the existence of a relevant creditor.... Standing is an essential element of a § 544(b) action...").

▆ The court finds these latter cases more persuasive. Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. PROC. 8(a). Rule 8(a) is designed to ensure that a defendant has fair notice of the nature of the claim and of the facts on which it is based. *Conley, supra,* 355 U.S. at 47–48, 78 S.Ct. 99. See also *In re Marino,* 37 F.3d 1354, 1357 (9th Cir.1994) (noting that the federal courts' liberal pleading policy "does not justify the conclusion that any document filed in a court giving some notice of claim satisfies the requirements of the Federal Rules"). "Effective pleading ... provide[s] the defendant with a basis for assessing the initial strength of the plaintiff's claim, for preserving relevant evidence, for identifying any related counter- or cross-claims, and for preparing an appropriate answer." *Grid Systems Corp. v. Texas Instruments Inc.,* 771 F.Supp. 1033, 1037 (N.D.Cal.1991). Unless Neilson is required to allege specifically the identity of the unsecured creditor(s) whose rights he is asserting, defendants will have no way to "assess[ ] the initial strength of [his] claim, ... preserv[e] relevant evidence, ... identify[ ] any related counter- or cross-claims, and ... prepar[e] an appropriate answer." *Id.* Accordingly, the court grants Imperial's motion to dismiss Neilson's fraudulent transfer claim to the extent it relies on the existence of unidentified unsecured creditors who could avoid the transfers under state law in the absence of the bankruptcy proceeding. Neilson may amend to identify these creditors, or remove reference to them from the complaint.

### K. Whether Plaintiff Fred Ockrim's Claims Are Barred By Res Judicata

Union Bank and the Bank of Orange County contend that all of plaintiff Fred Ockrim's claims are barred by res judicata. It is undisputed that Ockrim was named as a plaintiff in the first amended complaint filed in a related case, *Christensen v. Union Bank,* CV 02–00608 MMM (CWx). The court dismissed all claims in the *Christensen* first amended complaint on September 18, 2002, and directed that the *Christensen* plaintiffs file any amended complaint within twenty days of the date of the order. This deadline was subsequently extended one week pursuant to stipulation of the parties. The *Christensen* plaintiffs timely filed a second amended complaint on October 15, 2002. Ockrim, however, did not join the second amended complaint. Instead, he withdrew from the *Christensen* case and became a plaintiff in this case. Union Bank accordingly moved to dismiss Ockrim's claims in *Christensen* pursuant to Rule 41(d) for failure to comply with the court's order. The court granted this motion and dismissed Ockrim's claims with prejudice on January 8, 2003. Union Bank and the Bank of Orange County argue that Ockrim's claims in the instant suit are now barred by res judicata.

▆ " 'Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action.' " *Owens v. Kaiser Foundation Health Plan, Inc.,* 244 F.3d 708, 713 (9th Cir.2001) (quoting *Western Radio Servs. Co. v. Glickman,* 123 F.3d 1189, 1192 (9th Cir.1997)); *Robi v. Five Platters, Inc.,* 838 F.2d 318, 321 (9th Cir.1988) ("Claim preclusion 'prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding,' " quoting *Brown v. Felsen,* 442 U.S. 127, 137, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979)). The doctrine is applicable whenever there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or

privity between parties." *Owens, supra,* 244 F.3d at 713; *Western Radio, supra,* 123 F.3d at 1192 (same); *Robi, supra,* 838 F.2d at 324 (same).

 Ockrim's claims against the Bank of Orange County are not barred by res judicata for the simple reason that Bank of Orange County was not, and is not, in privity with any of the parties in *Christensen.* The Ninth Circuit has recognized that a non-party who has succeeded to a party's interest in property is in privity with that party and bound by any prior judgment against it. See *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 322 F.3d 1064, 1082 (9th Cir.2003) ("Federal courts have deemed several relationships 'sufficiently close' to justify a finding of 'privity' and, therefore, preclusion under the doctrine of res judicata: 'First, a non-party who has succeeded to a party's interest in property is bound by any prior judgment against the party," quoting *In re Schimmels,* 127 F.3d 875, 881 (9th Cir.1997)). Here, the third amended complaint alleges that Bank of Orange County is the direct successor-in-interest to Pacific Inland Bank.[112] It also alleges that Union Bank is the successor-in-interest to the trust business of Imperial Trust.[113] The remainder of Imperial Trust was merged into Imperial Management.[114] While Bank of Orange County argues that Imperial Trust Company is the successor-in-interest to Pacific Inland Bank, the complaint does not so allege, and Bank of Orange County offers no evidence to support this assertion. Even ac-

cepting the truth of the bank's claim, the transfers and acquisitions are such that they are is not, without more, sufficient to support a finding that the Bank of Orange County a privy of Union Bank. Thus, Bank of Orange County cannot use affirmatively against Ockrim the dismissal with prejudice of his claims against Union Bank in the *Christensen* suit.[115]

Union Bank, however, can invoke the doctrine of res judicata to bar Ockrim's claims in this action, as all prerequisites to the application of the doctrine have been met. First, there was clearly a final judgment on the merits in *Christensen* dismissing all of Ockrim's claims with prejudice. Second, this action involves the same claims Ockrim asserted in *Christensen,* as well as several new claims that Ockrim could have asserted there. Finally, there is an identity of parties, as Ockrim was a plaintiff and Union Bank a defendant in *Christensen,* and both are parties to the instant suit as well.

Plaintiffs do not dispute that the prerequisites to the application of claim preclusion have been satisfied as respects Union Bank. They argue, however, that Ockrim's claims against Union Bank are not barred by res judicata because Union Bank stipulated that Ockrim could be added as a named plaintiff in this case. Specifically, plaintiffs cite a stipulation regarding a briefing schedule on defendants' motions to dismiss the first amended complaint signed by all parties, and the order thereon entered by the court on October 28, 2002.[116] The stipulation provides:

---

**112.** *Id.,* ¶ 31.

**113.** *Id.,* ¶ 27.

**114.** *Id.,* ¶ 30.

**115.** The court does not finally decide this issue because the record presently before it concerning the nature of the transfers of ownership is incomplete and ambiguous. Bank of Orange County may, if it is able to demon-

strate that it is in privity with Union Bank, raise the issue at a later point in the proceedings.

**116.** Declaration of Christopher Casamassima in Support of Plaintiff's Oppositions to Union Bank of California, N.A.'s, Comerica Bank—California's, and Bank of Orange County's Motions to Dismiss Plaintiff's Third Amended Complaint ("Casamassima Decl."), Exh. 3.

"... In the interest of providing a uniform and mutually agreeable briefing schedule on defendants' respective motions to dismiss the First Amended Complaint,

1. Plaintiffs' opposition papers to the motions filed by defendants on October 25, 2002 shall be filed and served by November 18, 2002.

2. Defendants' reply papers shall be filed and served by December 9, 2002.

3. The hearing on the motions shall take place on January 6, 2003." [117]

The stipulation also contains a footnote, which states: "Plaintiffs have represented to defendants that they would be filing their First Amended Complaint ("FAC") simultaneously with the filing of defendants' motions on October 25, 2002. Plaintiffs further represented that the FAC would be identical to the original complaint filed September 5, 2002 with the exceptions that: (1) a Mr. Fred Ockrim would be added as a named plaintiff; and (2) a single paragraph would be added describing Mr. Ockrim and his relation to the case." [118]

Plaintiffs argue this pleading clearly demonstrates that the Banks stipulated to the joinder of Ockrim as a plaintiff in this case, and that they waived any res judicata objections they might otherwise have to his claims. Union Bank counters that the stipulation concerned a briefing schedule for the motions to dismiss. Neither interpretation is the only reasonable construction that could be given to the language of the stipulation. Rather, whether the stipulation was intended solely to set forth a briefing schedule or also to encompass an agreement regarding the addition of Ockrim as a plaintiff is unclear on the face of the document.

Several factors favor defendants' interpretation of the stipulation. The title of the stipulation suggests that it memorializes only an agreement regarding a briefing schedule on the motions to dismiss, and the bulk of the language found in the stipulation addresses this subject. The footnote that discusses Ockrim, moreover, does not directly recite Union Bank's agreement to have him added as a plaintiff. It simply memorializes the fact that he will be named in the first amended complaint.

Other aspects of the stipulation, however, arguably favor plaintiffs' interpretation. While the footnote concerning Ockrim's addition as a plaintiff does not expressly waive any objections by Union Bank, for example, it also does not explicitly assert objections. Its silence on the point could be read as implicit acquiescence in the amendment described. Union Bank clearly knew that Ockrim was one of the *Christensen* plaintiffs. Given this fact, its failure to note a specific objection to his joinder as a plaintiff could be viewed as significant. Certainly, the matter is not entirely unambiguous.

Plaintiffs assert that Ockrim "never would have entered into the stipulation with defendants to join the *Neilson* action as a named plaintiff (and by doing so given up his opportunity to file an amended complaint in *Christensen*) if he believed defendants would assert res judicata to bar his claims." Union Bank labels this argument illogical, noting that Ockrim had already given up his opportunity to file an amended complaint in *Christensen* before he sought to join *Neilson* as a named plaintiff. The second amended complaint in *Christensen* was filed on October 16, 2003. Ockrim was not named as a plaintiff in that pleading. Union Bank has proffered evidence that it was not until October 17,

117. *Id.*

118. *Id.*

2002—one day *after* Ockrim failed to join the second amended complaint in *Christensen*—that plaintiffs sought to add him as a party in this case. Union Bank's counsel declares: "The parties met and conferred on defendants' motion to dismiss Plaintiffs' original complaint on October 17, 2002. This was the first time Plaintiffs ... mentioned to Union Bank their intent to add Fred Ockrim as a named plaintiff in *Neilson*. It was also the first time Union Bank ... heard from any source that Ockrim intended to join *Neilson*."[119] Given this chronology, Union Bank argues, Ockrim abandoned his *Christensen* claims before plaintiffs ever raised the idea of adding him as a plaintiff in *Nielson*. Plaintiffs do not dispute these facts, and proffer no evidence to the contrary.

■■■ While the weight of the evidence currently before the court supports Union Bank's position, the matter has been raised in the context of a motion to dismiss brought pursuant to Rule 12(b)(6). In deciding such a motion, the court's review is limited to the contents of the complaint, exhibits attached thereto and matters that are properly the subject of judicial notice. *Branch, supra*, 14 F.3d at 454; *Hal Roach Studios, supra*, 896 F.2d at 1555, n. 19. While the stipulation is the type of court document that can be judicially noticed, the parties' intent in entering into the stipulation is not. See *Jones, supra*, 29 F.3d at 1553 (court may take judicial notice of court documents only for the purpose of recognizing "the 'judicial act' that the order represents on the subject matter of the litigation"). This is particularly true where the parties dispute the import of the agreement memorialized in the stipulation and the document is not unambiguous on its face.

While the parties proffer evidence regarding the manner in which the stipula-

tion should be interpreted, the court may not weigh evidence in deciding a motion to dismiss. See, e.g., *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir.2003) ("A court's task 'in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof,'" quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998)); *County of Santa Fe, N.M. v. Public Service Co. of New Mexico*, 311 F.3d 1031, 1035 (10th Cir. 2002) (" 'The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted,'" quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991)); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468, n. 6 (4th Cir. 1999) ("[I]t is inappropriate in addressing the appropriateness of a dismissal under Rule 12(b)(6) to make a determination concerning the weight of the evidence that ultimately may be presented in support of these various positions,") citing Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE, § 1356 (2d ed.1990) (explaining that "[t]he purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or the merits of the case"); *Jones v. Johnson*, 781 F.2d 769, 772, n. 1 (9th Cir.1986) ("[A]ny weighing of the evidence is inappropriate on a 12(b)(6) motion"); *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1086, 1089 (C.D.Cal.1999) ("On a motion to dismiss, the Court evaluates only the legal sufficiency of a complaint

---

**119.** Declaration of Martin Pritikin, ¶ 6.

and not the weight of the evidence supporting it").

Since Ockrim has stated cognizable claims against Union Bank, and since the court is unable to determine, as a matter of law, whether those claims are barred by res judicata, it must allow them to proceed. Union Bank's motion to dismiss Ockrim's claims as barred by res judicata is therefore denied without prejudice to its right to renew the argument at a later stage of the litigation.

## L. Union Bank's Motion To Strike

Rule 12(f) provides that a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED.R.CIV.PROC. 12(f). Motions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic. See *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 669 (C.D.Cal.2000); *Bureerong v. Uvawas*, 922 F.Supp. 1450, 1478 (C.D.Cal.1996); *Colaprico v. Sun Microsystems, Inc.*, 758 F.Supp. 1335, 1339 (N.D.Cal.1991). Given their disfavored status, courts often require "a showing of prejudice by the moving party" before granting the requested relief. *Securities and Exchange Commission v. Sands*, 902 F.Supp. 1149, 1166 (C.D.Cal.1995) (citations omitted). The possibility that superfluous pleadings will cause the trier of fact to draw "unwarranted" inferences at trial is the type of prejudice that will support the granting of a motion to strike. See *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir.1993) (holding that the district court properly struck lengthy, stale and previously litigated factual allegations to streamline the action), rev'd. on other grounds, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

Ultimately, whether to grant a motion to strike lies within the sound discretion of the district court. *Fantasy, supra*, 984 F.2d at 1528. In exercising its discretion, the court views the pleadings in the light most favorable to the non-moving party (see *In re 2TheMart.com Securities Litigation*, 114 F.Supp.2d 955, 965 (C.D.Cal.2000)), and resolves any doubt as to the relevance of the challenged allegations in favor of plaintiff. This is particularly true if the moving party demonstrates no resulting prejudice. *Wailua Assocs. v. Aetna Casualty and Surety Co.*, 183 F.R.D. 550, 553–54 (D.Haw.1998) ("Matter will not be stricken from a pleading unless it is clear that it can have no possible bearing upon the subject matter of the litigation; if there is any doubt as to whether under any contingency the matter may raise an issue, the motion may be denied . . .").

Union Bank moves to strike (1) allegations in paragraph 90 regarding corporate banking practices in general rather than practices of Union Bank in particular; (2) allegations in paragraph 102 referring to the Banks' alleged motive as "GREED". The court addresses each argument in turn.

Union Bank first seeks to strike the sentence in paragraph 90 of the third amended complaint that states: "In a world where banks charge ever-increasing fees to customers who bounce $10 checks, Union Bank's actions are all the more telling." Union Bank argues that allegations concerning the business practices of other banks are immaterial to plaintiffs' specific allegations of misconduct in this case. Instead, Union Bank contends, they serve no purpose other than to confuse the issues and prejudice it. While plaintiffs argue that the allegations "are not only true, but it places Union Bank's actions into context," they are, in fact, immaterial and

unnecessary. Furthermore, they serve to prejudice Union Bank since they seek to associate it with practices that are not at issue in this case. Because the matter is not material to the instant dispute and potentially prejudicial, the court grants the bank's motion to strike the referenced sentence in paragraph 90.

 Union Bank also seeks to strike the rhetorical question that appears in paragraph 102 of the third amended complaint—"Why then did the Banks lend Mr. Slatkin the hand he needed? *The Banks' motive: GREED.*" Union Bank argues this invective does nothing to inform it of the charges it must answer, but serves only to inflame and should be stricken. While plaintiffs contend the statement is true and places Union Bank's motives in context, the court agrees with the bank that the allegation is unnecessary. Accordingly, Union Bank's motion to strike this allegation is also granted.

## III. CONCLUSION

For the reasons stated, the court grants Comerica Bank of California's motion to dismiss the third amended complaint with prejudice. The court grants with leave to amend (1) the motions of Bank of Orange County and Leider to dismiss plaintiffs' fraud and negligent misrepresentation claims; and (2) Leider's motion to dismiss plaintiffs' claims for breach of fiduciary duty and constructive fraud. The court grants in part and denies in part (1) Imperial's motion to dismiss plaintiffs' claim to avoid and recover intentional fraudulent transfers using a seven-year reach back period; and (2) Leider's motion to dismiss plaintiffs' claims for aiding and abetting. Plaintiffs are given leave to amend these claims to address the deficiencies noted in this order. The court denies (1) the motions of Imperial Management, Union Bank, and Bank of Orange County to dismiss plaintiffs' claims for aiding and abetting; (2) Bank of Orange County's motion

to dismiss plaintiffs' claims for breach of fiduciary duty, constructive fraud, negligence, and violation of Business & Professions Code § 17200; and (3) the motions of Union Bank and Bank of Orange County to dismiss all claims of plaintiff Fred Ockrim with prejudice. Finally, the court grants Union Bank's motion to strike the first sentence of paragraph 90 and the entirety of paragraph 102. Plaintiffs may file an amended complaint within twenty days of the date of this order.

This order disposes of Docket Nos. 138, 141, 142, 145, 150, 151, 152, 165, 166, 167, and related pleadings.